U.S. DISTRICT COURT – N.D. OF N.Y.
FILED
Jun 16 - 2025
John M. Domurad, Clerk

U.S. DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

SUSAN KEITH
Plaintiff,
v.

ORAZIO CRISALLI and
ERIN L. CONDON,

Defendants.

Case No. 5:25-cv-00778 (MAD/MJK)
CIVIL COMPLAINT

JURY TRIAL DEMAND

Plaintiff Susan Keith brings this Complaint against Defendants Orazio "Ozzie" Crisalli and Erin Condon in their individual and official capacities as management operators—with Crisalli in his additional capacity as Managing Member and co-executive officer of SEC-regulated QP2 Properties, LLC—and as operators of federally regulated real estate investment operations.

**PRELIMINARY STATEMENT**

1. This action seeks comprehensive federal relief—substantial damages, injunctive relief, SEC notification, and judicial oversight within this Federal Court's specialized jurisdiction over securities fraud—to protect residents including young children and the elderly at *David's Landing of "Clay Marketplace A Lifestyle Center,"* a non-smoking community near Micron Technology's development in Clay, New York, from carcinogenic exposure and environmental contamination affecting air quality, building systems, and health of all occupants, including pets—caused by Defendants' undisclosed discriminatory modification of property policy to allow structure smoking while concealing this authorization from current residents and investors—and punitive damages for Defendants' systematic campaign including, upon information and belief, federal securities fraud through material omissions to investors managing millions in interstate capital, violations of SEC disclosure requirements,

fraudulent misrepresentation, breach of contract and warranty of habitability, retaliation, and negligence.

2. Plaintiff leases from QP2 Properties, LLC, a SEC-registered investment entity co-owned by Defendant Crisalli that was specifically created for this brand-new, premier development and registered with the SEC—distinct from Crisalli's regular property management company that also manages the property, creating a cloudy corporate structure—with Plaintiff's monthly lease payments flowing directly to the investment operation that distributes returns to investors in a $5,000,000 SEC offering, making Plaintiff's payments investor capital subject to federal securities disclosure requirements; however, in standard property management operations, payments flow to the property management company for operating expenses and owner profits, creating typical landlord-resident relationships subject to state jurisdiction, but not in this case.

3. Defendant Crisalli explicitly invited legal action by stating he was *"looking forward to talking to [Plaintiff's] attorney"* while systematically ignoring Plaintiff's pre-litigation notices—ignored and mocked by Crisalli— sent only after Defendants refused to address smoking contamination with documented health ill effects—with Plaintiff after learning directly from the critical source that Defendant Crisalli had intentionally violated the property's smoking policy allowing smoking in the structure—with Defendant Crisalli committing fraud by sending false texts promising to "investigate" and meet with Plaintiff and *"talk to all parties"* when he knew he had authorized the smoking violations—yet failed to current residents —or investors— of this material litigation exposure as required by SEC disclosure obligations, requiring federal enforcement powers including immediate SEC notification, criminal referral authority, and investor protection measures to address

systematic fraud through discriminatory undisclosed accommodations and deception that, upon information and belief, conceals ongoing litigation exposure from investors while endangering residents through EPA-classified carcinogenic exposure.

4. The documented health ill effects include EPA-classified carcinogenic exposure that poses particular dangers to vulnerable populations, with research indicating that exposure to tobacco, vaping, and marijuana during sensitive developmental periods can cause significant negative health effects on babies, children, and the elderly—including low birth weight, SIDS, asthma, bronchitis, pneumonia, ear infections, impaired brain and lung development, hearing problems, attention and learning issues, and worsened respiratory conditions like COPD and emphysema—with studies showing that secondhand smoke exposure can affect vascular function and lead to respiratory issues, while vaping can harm developing lungs and brains, potentially leading to nicotine addiction and increased risk of future cigarette use, and thirdhand smoke residues left on surfaces can exacerbate respiratory issues in children—requiring immediate federal intervention to protect these vulnerable residents from Defendants' systematic authorization of carcinogenic exposure in violation of their non-smoking community health standards and taxpayer-funded obligations.

5. Plaintiff has subsequently requested HVAC filter replacement orally and multiple times through the official resident portal on April 16, April 29, and May 20, 2025—as Plaintiff lacks access her locked HVAC room and relies entirely on Defendants for implementation—yet Defendants have deliberately refused to provide even basic filter specifications despite Plaintiff's offer to purchase the replacement filter herself, constituting further constructive removal tactics designed to harm Plaintiff for challenging their property breaches while simultaneously compromising indoor air quality during ongoing smoke contamination.

6. Even upon move-in on December 20, 2024, Plaintiff requested a new HVAC filter from on-site maintenance employee Brandon Crandall due to construction dust—as Plaintiff, having purchased and sold four new construction homes over the past two decades, understands that construction dust clogs filters rapidly and requires immediate replacement after construction to protect HVAC systems and indoor air quality—with the leasing agent, Justin Surlock, present as witness—yet Crandall dismissed Plaintiff's experienced assessment by claiming the existing filter had *only a little dust* and that he will *wash* the filter, a practice that damages filter integrity and reduces filtration effectiveness, demonstrating Defendants' pattern of inadequate maintenance, disregard for proper HVAC care and indifference to air quality standards from the inception in this brand-new SEC-registered real estate investment entity where proper air filtration should be a priority.
7. Defendant Crisalli's conduct constitutes systematic fraud through material misrepresentations—promising to *"investigate"* smoking violations and meet with Plaintiff to *"talk to all parties"* while possessing knowledge of falsity that he had personally authorized the smoking accommodation he was pretending to investigate—with intent to deceive Plaintiff, other residents, and investors about the true nature of property operations and property policy modifications—causing Plaintiff to rely on these false promises while suffering continued carcinogenic exposure and health deterioration, and investors to remain unaware of substantial litigation exposure, warranty of habitability breaches, and operational violations materially affecting their investment safety.
8. This systematic deception involves a coordinated conspiracy—including Defendant Condon's fabrication of false allegations eighteen (18) days after courtesy neighbor conversations, coordinating with maintenance to conceal a defective appliance repair while

deflecting from smoking violations, and removal of smoke evidence when contamination becomes excessive—a calculated enterprise to conceal authorized smoking from investors—silence resident reporting through retaliation—and obstruct evidence creating litigation exposure and SEC disclosure obligations—establishing, upon information and belief, a pattern of racketeering activity under the Racketeer Influenced and Corrupt Organizations Act (RICO) affecting interstate commerce through an organized criminal enterprise consisting of Defendants and their agents engaging in multiple predicate acts including securities fraud through material omissions to investors in the $5,000,000 interstate offering, mail fraud and wire fraud in furtherance of the investment scheme, obstruction of justice through falsified maintenance reports and coordinated cover-up activities, conspiracy to defraud investors and residents, and systematic violations of federal disclosure requirements—all conducted through the SEC-registered investment entity while using interstate communications and investor capital to perpetuate the fraudulent scheme affecting multiple victims across state lines, requiring immediate federal intervention, criminal referral consideration, and RICO civil enforcement to dismantle this sophisticated criminal enterprise operating under the guise of legitimate real estate investment.

9. Tellingly, after the explosive revelations on June 12, 2025, and the invitation to Plaintiff by Defendant Crisalli mocking and welcoming legal action, that exposed the conspiracy and coordination to make Plaintiff's unit uninhabitable, the smoking violations significantly decreased during the weekend of June 14-15, 2025 and mostly consisted of fumes from the secondary violations that began after the authorized smoking was allowed on the property—revealing the sophisticated deception behind Defendants' authorized smoking accommodation that violated both property policy and New York law prohibiting smoking

anywhere on the structure for properties that are non-smoking, including patios and within 25 feet of the structure, constituting material operational changes in this SEC-registered real estate investment entity that were systematically concealed from investors who had reasonable expectations of legal compliance and professional property management in their $5,000,000 investment offering.

10. Only through the voluntary disclosure of another resident on May 25, 2025, did Plaintiff discover that both the primary smoker, authorized by Defendant Crisalli, and his partner were smoking in the property structure—with the primary resident smoking both inside and on his patio—both clear policy violations—while his hidden partner, upon information and belief, smoked primarily indoors—creating a deliberate system where Plaintiff could never escape smoke infiltration regardless of whether she opened windows or kept them closed, as indoor smoking from the concealed occupant would infiltrate directly while patio smoking would drift back into the property structure, precisely why properties maintain 25-foot smoking restrictions.

11. Defendant Crisalli, upon information and belief, knew or should have known that systematic operational violations in this SEC-registered investment entity created undisclosed liability exposure for investors while Defendants attempted to conceal evidence through unconstitutional restrictions—with Defendant Condon on June 12, 2025, falsely claiming Plaintiff could not *talk to other[residents]*—as Defendants, upon information and belief, panicked after their reliance on Crandall's intelligence failed when Plaintiff, despite her fear of retaliation expressed to Crandall—who knew about the authorized smoking—obtained crucial evidence exposing their fraud scheme, violating federal securities disclosure obligations and First Amendment rights.

**SEC-REGULATED PROFESSIONAL REAL ESTATE INVESTMENT OPERATIONS**

12. The U.S. Securities and Exchange Commission (SEC) filings dated October 5, 2023, reveal Defendant Crisalli—who invited Plaintiff to file this lawsuit on June 12, 2025, while mocking her pre-litigation notice after he refused to enforce the non-smoking property policy, attempting to intimidate Plaintiff by inquiring "*when will I hear from your attorney? frankly, I am looking forward to talking to them*"—operates a sophisticated $5,000,000 real estate investment offering through QP2 Properties, LLC (CIK 0001983557), a different entity from his property management company, with a $62,500 minimum investment threshold and professional broker involvement through Pinnacle Investments, LLC, establishing him as a professional real estate investor subject to federal securities regulations, heightened fiduciary duties, and disclosure obligations to investors and regulatory authorities.

13. Federal securities regulations require REITs to disclose material lease modifications under ASC 842 standards—yet Defendant Crisalli, upon information and belief, secretly modified property policy to allow smoking in a non-smoking property without required SEC disclosure via Form 8-K filings while concealing these modifications from other residents who relied on non-smoking provisions and fraudulently pretending to investigate the breaches—constituting material undisclosed changes affecting property values, health liabilities, and investor decision-making in violation of federal disclosure requirements and depriving investors of material information while operating under false pretenses about property characteristics and compliance.

14. Defendant Crisalli's systematic fraud against current leaseholders constitutes a massive breach of fiduciary duty to investors who entrusted millions of dollars to his professional real estate operations—creating substantial undisclosed litigation liability that violates SEC

disclosure obligations and professional investment standards—demonstrating that this conduct represents calculated harm, fraudulent concealment, and vindictive retaliation when exposed, thereby exposing investors to catastrophic financial risk through Crisalli's deliberate misconduct that generates the exact type of material litigation exposure requiring immediate disclosure under federal securities law.

15. Research demonstrates that allowing smoking in rental investment properties causes significant property devaluation for investors—with studies indicating potential resale value reductions of 29-30% due to several factors including increased fire risks and higher insurance premiums—while simultaneously reducing marketability through decreased resident pools and longer vacancy periods, creating substantial operational cost increases and legal liability exposure—yet Defendants systematically concealed these material changes from investors by secretly authorizing smoking accommodations while maintaining false representations about non-smoking property characteristics, violating SEC disclosure requirements for REITs that mandate investor notification of lease modifications affecting property value, cash flows, and risk profiles under ASC 842 compliance standards and Form 8-K filing obligations.

**ONONDAGA COUNTY INDUSTRIAL DEVELOPMENT AGENCY TAXPAYER-FUNDED BENEFITS AND BANK DISCLOSURES**

16. Defendant Crisalli's systematic fraud against current residents creates substantial undisclosed risk for bank lenders who have may have provided construction financing for the luxury building project, as banks rely on property management performance and legal compliance when extending credit, yet Crisalli has deliberately engaged in conduct that invites litigation while potentially concealing this liability exposure from lending institutions.

17. Defendant applied for $1.3 million in sales tax abatements and $169,418 in mortgage recording tax exemptions from the Onondaga County Industrial Development Agency while simultaneously engaging in systematic fraud against residents, creating a situation where taxpayer funds are subsidizing deliberate resident abuse and uninhabitable conditions that expose residents to carcinogenic substances, representing a profound betrayal of public trust and the community benefit purposes for which such tax abatements are granted.

(Source: www.syracuse.com/news/2023/08/builders-seek-15-million-tax-break-for-apartment-and-retail-project-in-clay.html).

18. The corporate structure led by Defendant Crisalli deliberately conceals from the public that what appears to be a simple property management company, Syracuse Realty, LLC, is actually this sophisticated SEC-regulated real estate investment operation, QP2 Properties, LLC, with Crisalli serving as both Executive Officer of the property entity and operator of the management company.

**HEALTH FOUNDATION BOARD MEMBER, ORAZIO "OZZIE" CRISALLI, PUBLIC HEALTH ADVOCATE TO PRIVATE HEALTH DESTROYER**

19. The stark contradiction between Defendant Crisalli's service as a Helio Health Foundation board member—where Crisalli publicly advocates for community health and wellness as detailed in the organization's August 2022 newsletter featuring his personal addiction tragedy—and his subsequent use of $1.3 million in taxpayer-funded benefits to operate a property that deliberately expose residents to carcinogenic substances represents a calculated abandonment of health principles for profit and a profound betrayal of the public trust and community benefit purposes for which such tax abatements are granted. (Source: www.helio.health/wp-content/uploads/2022/08/ Recovery-Today-Newsletter_August-2022.pdf).

20. Defendant Crisalli's service at an organization dedicated to health and wellness, combined with his documented personal tragedy of losing his precious son to heroin overdose six years ago, makes his conduct in this matter absolutely hypocritical and unconscionable. How can any parent dishonor their child's struggle and memory through such harmful misconduct that deliberately enables addiction while exposing innocent residents to carcinogenic substances?

21. Despite Defendant Crisalli's public advocacy for health and wellness and his personal understanding of addiction's devastating impact through his own public story published in the Helio Health August 2022 Newsletter, Crisalli, upon information and belief, personally authorized smoking accommodations that expose residents to EPA-classified Class A carcinogens, demonstrating a calculated disregard for the very health principles he publicly champions.

## INVITATION TO LEGAL ACTION AFTER NOTICE OF CLAIM

23. On June 12, 2025, Defendant Crisalli's legal invitation *"when will I hear from your attorney? frankly, I am looking forward to talking to them,"* becomes particularly alarming when viewed in the context that he operates both the management company and owns the property, making his attitude toward litigation a reckless endangerment of his own real estate investment.

24. Defendant Crisalli's eagerness for legal action demonstrates shocking disregard for basic business judgment and resident legal rights, as he actively invites litigation against his own company while ignoring Plaintiff's formal notices of claim, revealing his mistaken assumption that legal notices from self-advocating leasing residents are meaningless, and that Plaintiff would not follow through with actual legal action despite his systematic misconduct.

25. As both property owner and management company operator, Defendant Crisalli has no one to blame for the smoking accommodations contrary to the property's non-smoking designation, the confrontational stance, or the systematic fraud that has provoked this legal action.

26. Defendant Crisalli's *"looking forward"* to legal proceedings reveals either profound unawareness of basic property management principles and investment ownership duties or a deliberate strategy to harm leasing residents through intimidation, both of which demonstrate his incapacity as a professional real estate investor subject to SEC regulatory obligations and a reckless disregard for the financial and reputational harm his unauthorized conduct will cause to the innocent property investors who trusted him to manage their investments professionally and lawfully.

**DEFENDANT CRISALLI'S JUNE 12, 2025 PROVOCATIVE EMAIL ABOUT SCHEDULING THE TELECONFERENCE REGARDING SMOKING**

27. Defendant Crisalli makes false claims in his June 12 email to diminish, demean, retaliate, and deflect from the legal smoking property modifications he authorized, seeking retaliation through a falsified Repair Report regarding a washer that had not been properly repaired over multiple visits—despite the electronic board being replaced during the second visit, proving the appliance was defective from the start—yet continued malfunctioning differently, demonstrating the need for complete replacement rather than repeated failed repairs.

28. This systematic appliance sabotage occurred immediately after Plaintiff began reporting smoking violations on April 4, 2025—with on-site maintenance employee Brandon Crandall having full knowledge of these reports—demonstrating Defendants' retaliatory scheme to create multiple habitability issues, make the premises uninhabitable rather than address their authorized smoking modifications that violated property contract terms and New York law.

29. The contradictory repair instructions demonstrate exploited systematic deception:

    a) First visit: On or about April 16, 2025, on-site maintenance employee Brandon Crandall, who is not a repair technician, ran cycles himself for over an hour, falsely reporting to Defendant Condon, *"no issue, it works now"* when the problem was intermittent—only after Plaintiff reported that the problem continued did Crandall bring in the washer technician who happened to be on site, in which after the technician completed his assessment, Crandall instructed Plaintiff to *"run two empty cycles with hot water"*;

    b) Second visit: After Plaintiff's May 20, 2025, request, the second technician replaced the electronic board, then advised Plaintiff to use only a tablespoon of detergent, stating to *"ignore the manual"* claiming manuals are useless;

c) Third visit: After Plaintiff's June 3, 2025, request, the first technician returned on June 11, 2025, with the technician making baseless accusations, claiming Plaintiff should have gone *"two weeks without any soap [detergent]"*—an instruction never given and completely impractical—yet after examination, admitted "soap" was not the issue for the humming and complete shut-offs, as any soap residue found in the washer body resulted from the machine's own malfunctioning overfill cycles and excessive spinning during documented operational failures, not from Plaintiff's detergent usage.

30. Defendants exploited this coordinated effort to create false blame when all previous repair attempts had failed, with the technician and Crandall on June 11, 2025, demonstrating further coordination when both suddenly *remembered* they had shoe covers after Plaintiff refused to provide them at her own expense as she had been doing for months.

31. Despite this fabricated claim as Plaintiff reported to Defendant Condon on June 12, 2025, when the technician conducted his own towel experiment on this third service visit, demanding clean terry towels from Plaintiff to test his *"soap"* theory, then complaining when Plaintiff could only provide Turkish cotton towels that needed washing, the test completely failed to reproduce any soap-related malfunction, and he explicitly told Plaintiff that soap was *not* the problem before leaving—mentioning screenshots from his first visit showed consecutive washings—yet when Plaintiff confronted him about falsely accusing her before testing, the conversation escalated because Plaintiff refused to accept false blame for his non-repair.

32. While during this same phone call with Defendant Condon on June 12, 2025, Plaintiff discovered the on-site maintenance employee, Brandon Crandall, socializing with the

authorized smoking violator and a visitor on his patio when she sought assistance from Crandall so he could confirm the falsification of the report, not knowing that he assisted in its falsity.

33. Defendants still referenced this false report claiming *"soap"* was the cause to shift blame onto Plaintiff and provide justification for any counter-attack while avoiding the smoking core issue, including Defendant Crisalli's retaliatory threat and service restrictions, stating technician refuses to provide service while Plaintiff is present, despite Defendant Condon having previously stated they would need to *"take the machine apart"* and the technician acknowledging upon leaving that there was still an issue, advising Plaintiff to *"wait between washes"* while bizarrely justifying this defective appliance operation by referencing screenshots from two visits prior showing Plaintiff's normal consecutive washing loads—demonstrating they identified a separate mechanical timing issue completely unrelated to *soap*, yet deliberately reinserted the disproven soap theory into their false report to create fabricated blame against Plaintiff—while Defendant Condon defended the false report that was kept secret from Plaintiff until she contacted Defendant on June 12, 2025, as they deflected from the fraudulent smoking violation they authorized.

34. Defendant Crisalli's full email sent on June 12, 2025—to address the scheduled teleconference regarding smoking violations—instead reveals his psychological breakdown when confronted about the material property modifications for this SEC-registered investment entity and his attempts at constructive removal through fraud and retaliation for reporting habitability violations—a systematic campaign to force Plaintiff's voluntary departure by making the property so uninhabitable that she would abandon her lease rights rather than Defendants addressing the smoking accommodation fraud.

35. Following is Defendant Crisalli's second and only other direct communication to Plaintiff—his June 12, 2025 meltdown email that completely abandoned his previous facade of concern—demonstrating how Defendant Condon's use of false reports and coordination with on-site maintenance employee Brandon Crandall led him to deflect from the smoking violations he had personally authorized while inviting legal action against his own SEC-registered investment company and its investors:

> *"Please be advised from this day forward I will be the only person from [] you are allowed* [DISCRIMINATORY ATTEMPT] *to communicate with, every employee in the company has been instructed to terminate communication with you. You can leave me a message on the office phone or via email, do not use my cell phone, your number has been blocked.* [PLAINTIFF HAD NO IDEA THE TEXT # PROVIDED TO RESIDENTS FOR REPORTING CONCERNS WAS HIS # WHICH EXPLAINS THE RESPONSES OR LACK THEREOF]*, With respect to your washer/dryer appliance, we will not replace it. It does not work because you did not follow the simple instructions that were provided by the factory trained technician. The cost of a replacement is $1,200, if you want to buy a replacement, we can assist you with the purchase and installation. The cost of a new unit will be deducted from your security deposit. You asked to be released from your lease, we agreed to your request, are you looking for another apartment? All our units are committed to other [residents]; we cannot offer you another apartment. You also mentioned filing legal documents [DEFENDANT CRISALLI IS REFERRING TO THE AUTHORIZED SMOKING VIOLATION ONLY HERE], when will I hear from your attorney, frankly I am looking forward to talking to them. In summary you are done tying up the time of every employee in the company, deal with me directly, I am busy and frequently travel so it may take a few days for me to respond to you. Thank You"* [EMAIL SENT BY: ORAZIO "OZZIE" CRISALLI]

36. This hostile, retaliatory communication stands in stark contrast to his insincere but cooperative April 30, 2025 email, revealing his consciousness of guilt and reliance on Defendant Condon's false assessments, where he posed as a concerned property owner genuinely interested in addressing the smoking violations he had knowingly and unlawfully authorized in breach of property policy:

> *"I am one of the two owners at [] , the managing agent for []. My business partner, [] and I are aware of the ongoing issues you have at your apartment and would like to suggest a virtual call to address your concerns. Please reply with some times that you are available and we will schedule the call accordingly."*

**DARVO TACTICS (DENY, ATTACK, REVERSE VICTIM AND OFFENDER)**

37. This case exemplifies the classic DARVO tactics (*Deny, Attack, Reverse Victim and Offender*) employed by wrongdoers when confronted with evidence of their misconduct.

38. When Plaintiff discovered Defendants systematic fraud and coordination with lease violators while acting on behalf of QP2 Properties, LLC, Defendant Condon immediately: (1) Denied her coordinated deception despite documented evidence and stating it is "*none of [Plaintiff's] business*" about the secret approved violation to allow a resident to smoke on the property, (2) attacked Plaintiff by falsely implying Plaintiff couldn't speak respectful to others about legitimate evidence gathering, and (3) reversed the roles by positioning herself as the victim through Defendant Crisalli's email when he invoked "*every employee*" contact restrictions after Plaintiff exposes the fraud, when Plaintiff had only spoken to two employees, including Defendant Condon, regarding the smoking violations.

39. This pattern of DARVO tactics, commonly used to silence whistleblowers and evidence gatherers, demonstrates the calculated nature of Defendant's misconduct and her awareness of guilt when confronted with proof of their fraudulent conduct, cover-up, and conspiracy.

40. On June 12, 2025, Defendant Condon informed Plaintiff that she would follow-up with Defendant Crisalli regarding the teleconference regarding the smoking violations that he proposed on April 20, 2025, but did not follow-up.

41. But what Plaintiff received from Defendant Crisalli, instead was that hostile retaliatory email that avoided the smoking violation teleconference, instead launching a provocative attack regarding the washer repair service and revealing that the repair technician and the on-site maintenance employee, Brandon Crandall, had falsified a Repair Report without any intention of disclosing it to Plaintiff.

**BEFORE AND AFTER THE FRAUD DISCOVERY: DEFENDANT CRISALLI'S CONTRADICTORY EMAILS EXPOSE HIS CONSCIOUSNESS OF GUILT APRIL 30, 2025 (PRE-DISCOVERY) AND JUNE 12, 2025 (POST-EXPOSURE)**

42. On April 30, 2025, Defendant Crisalli, Defendant wrote an innocuous email that appeared to show genuine concern for resolving the smoking violations, stating his intention to schedule a teleconference to address Plaintiff's ongoing reports of unauthorized smoking, creating the false impression that ownership was committed to enforcing the property's non-smoking policy and working collaboratively with Plaintiff to resolve the habitability issues, writing in an email: *"I am one of the two owners at [] , the managing agent for []. My business partner, [] and I are aware of the ongoing issues you have at your apartment and would like to suggest a virtual call to address your concerns. Please reply with some times that you are available and we will schedule the call accordingly."*

43. Defendant Crisalli's April 30, 2025 email reveals his calculated attempt to conceal his true ownership status and legal liability by deceptively identifying himself as merely *"the managing agent for []"* while burying his admission that he is also *"one of the two owners"* of the property investment company, QP2 Properties, LLC, creating the false impression that he operates as a hired contractor rather than the Executive Officer and professional real estate investor controlling a $5,000,000 SEC-regulated investment operation.

44. Defendant Crisalli's deliberate mischaracterization demonstrates Defendant's consciousness of guilt regarding his direct ownership liability and his systematic effort to minimize his authority and responsibility while simultaneously exercising complete control over property operations, lease modifications, and smoking accommodations, revealing his intent to deceive Plaintiff about the true scope of his decision-making power and legal accountability for the systematic misconduct that followed.

45. Plaintiff responded with available times for the virtual call to address the smoking violations, but Defendant Crisalli failed to schedule the promised meeting.

46. On June 12, 2025, when Plaintiff asked Defendant Condon to follow up with Defendant Crisalli's schedule regarding the virtual call he had promised on April 30, Crisalli responded with immediate hostility rather than scheduling the meeting he had initiated.

47. Defendant Crisalli's belligerent email deliberately avoided the smoking violations topic he was to address in the virtual call, instead deflecting to the washer issue to avoid accountability for his secret smoking accommodation.

*48.* On June 12, 2025, Defendant stated she would get back to Plaintiff regarding Defendant Crisalli's schedule for the promised April 30 teleconference regarding the smoking violation, but instead of scheduling the meeting, Defendant Crisalli sent his belligerent email stating:

> *"Please be advised from this day forward I will be the only person from [] you are allowed to communicate with, every employee in the company has been instructed to terminate communication with you."*

49. Defendant Crisalli's email falsely claimed Plaintiff had *"asked to be released from your lease,"* when in fact Plaintiff had submitted a strategic notice to vacate to test their response after they began ignoring all violation reports, not as a request for lease release.

50. Defendant Crisalli's email continued:

> *"You can leave me a message on the office phone or via email, do not use my cell phone, your number has been blocked* [Plaintiff didn't know that the text number provided to all residents for reporting concerns was actually Defendant Crisalli's personal cell phone, and Plaintiff had only used this number to report smoking violations as authorized by the property management system, making his hostile reaction to legitimate violation reports

discriminatory and particularly revealing of his guilt and anger at being held accountable for violations he had secretly authorized]*,"* creating artificial barriers to emergency communications while claiming he is *"busy and frequently travel so it may take a few days for me to respond to you."*

51. The email's hostile tone escalated with:

*"You also mentioned filing legal documents, when will I hear from your attorney, frankly I am looking forward to talking to them"* [This professional real estate investor's arrogant challenge to legal action becomes particularly revealing given that he had completely ignored Plaintiff's formal notices of claim sent in May, demonstrating his systematic disregard for resident legal rights while simultaneously inviting the very litigation that would expose his fraudulent conduct—notably, Defendant Crisalli never denied any of the violations or misconduct alleged in Plaintiff's legal notices, instead choosing mockery and intimidation].

52. Defendant Crisalli's false claim that Plaintiff was *"tying up the time of every employee"* was demonstrably untrue, as Plaintiff had minimal contact with only two employees regarding the smoking violations: Defendant Condon—twice by phone—and the on-site maintenance employee, Brandon Crandall, regarding habitability matters.

53. Rather than providing his availability for the teleconference he had initiated, Defendant Crisalli coordinated this nuclear retaliation with Defendant, revealing his intent to avoid accountability through intimidation and mockery rather than face questions about his systematic fraud.

**THE CONSPIRACY UNRAVELED: UNDERESTIMATION OF FORMER HOMEOWNER**

54. This case reveals a calculated conspiracy orchestrated by Defendants and the on-site maintenance employee, Brandon Crandall, to systematically deny resident rights to someone they initially perceived as a vulnerable target.

55. The conspiracy began with delay tactics orchestrated by Defendants and the on-site maintenance employee, Brandon Crandall, through false enforcement promises and a fake *"investigation"*—text response from Defendant Crisalli to delegate to Crandall — on April 24, 2025, while knowing the fraud replied after Plaintiff reported a violation:

> "*Thank you for reporting concerns. We will investigate and address the issue with the appropriate parties*."

56. Defendants knew the smoking breach was authorized but fraudulent sent Plaintiff this misrepresented text and fraudulent investigation response.

57. When Plaintiff confided in the on-site maintenance employee, Brandon Crandall, who reports to Defendant Condon, about fearing retaliation, if she spoke directly to neighbors about smoking sources, they believed they had successfully intimidated Plaintiff into silence and could continue their fraud indefinitely.

58. Defendants' scheme with Crandall relied on Plaintiff never discovering the secret smoking accommodation and accepting the false claims of enforcement difficulty by Defendant Condon.

59. However, Defendants' plan catastrophically failed when they ignored Plaintiff's continued violation reports through the daily reporting text system—Crisalli's personal mobile number— that Defendant fraudulently attempted to *mischaracterize* as daily reports of speaking to residents, which she knew was demonstrably false.

60. Plaintiff followed proper protocol in reporting major violations through the system Defendants had provided—despite being too exhausted to document every violation that occurred for hours on end—as Defendants never expected someone who understood proper documentation protocols to meticulously report these incidents.

61. Defendants' orchestrated conspiracy completely unraveled in their moment of greatest anger—when Plaintiff, finally feeling comfortable enough to have a courteous conversation with the main smoking resident, discovered the secret accommodation in real-time as he revealed the authorized agreement, explicitly naming *"Ozzie [Defendant Crisalli]"* as the co-owner who authorized the smoking violation—as Plaintiff was confused because she relied on the assurance of the leasing agent, Justin Surlock, in their detailed pre-leasing conversation that explicitly stated the smoking policy would be enforced and that this property is 100% non-smoking in its entirety, explicitly no smoking on the patio either—and the smoking resident, who was contractually authorized to smoke by Defendant Crisalli, offered to help redirect smoke by moving chairs, not understanding that particle dispersion made this futile.

62. This revelation, on May 23, 2025, exposed Defendants' entire fraud operation to someone they belatedly realized was not a typical renter—as on June 12, 2025, when Defendant Condon attempted to diminish Plaintiff by stating, you are just a *renter* you can't speak to other renters—they could manipulate, but an experienced homeowner who had owned four properties, understood construction, property management, and resident rights, could identify their tactics, and knew how to document and legally challenge their systematic misconduct - triggering their panicked escalation to fabricated reports, false claims, and coordinated retaliation that only provided more evidence of their conspiracy.

**INITIAL MOVE-IN WITH MICHAEL ARCURI, CO-OWNER AT HELM AND INITIAL REPORTING OF THE SMOKING BREACH AND HEALTH CONCERNS**

63. Plaintiff did meet Defendants during her initial move-in in December when Michael Arcuri, also a co-owner, arrived on-site on Saturday, December 21, 2024, to resolve a non-working hot water tank whose elements had burned out due to improper installation before water was added, and Plaintiff, unable to obtain maintenance response that cold evening, chose to endure the conditions without complaint, believing this would be an isolated incident with no expectation of compensation for the lack of hot water on her first night in a brand new property and Mr. Arcuri responded to appropriately and ensured that the repair was completed properly, allowing Plaintiff to return to her home for a hot bath.

64. The adversarial attitude of Defendants and the deliberate change in disposition of the on-site maintenance employee, Brandon Crandall, was in direct contrast to Plaintiff's pleasant exchanges with Mr. Arcuri and the leasing agent, Justin Surlock, before Defendant Condon arrived.

65. Mr. Arcuri remained pleasant and professional regarding all maintenance related communications previously, and was not included in the hostile communications, at least outwardly, while Defendant Crisalli wrote the belligerent June 12, 2025 email in response to Plaintiff asking Defendant Condon to follow up on scheduling the conference call that Defendant Crisalli had failed to follow through with, inviting this legal action.

66. However, Plaintiff was informed that her first phone call on April 4, 2025, to the management office at 5:00 PM would be routed to Mr. Arcuri's voicemail regarding the first report of the smoking violation and again on May 23, 2025, when Plaintiff directly sent a text to Mr. Arcuri regarding the cruelty of the misconduct after the main smoking resident revealed that it had been pre-authorized by Defendant Crisalli or both of them.

67. Plaintiff spoke with the on-site maintenance employee, Brandon Crandall, about three times about the ill-effects of the smoking violations, culminating in an emotional conversation during one particularly intense morning of violations when Crandall listened but when asked if he could smell the fumes or observe the explicit lease violations, instructed Plaintiff to review her lease and stated he was *"just maintenance."*

68. On June 12, 2025, the on-site maintenance employee, Brandon Crandall, was observed on the patio socializing with the primary smoking resident and a guest, demonstrating the coordinated nature of misconduct.

69. The complete record of text message communications between Plaintiff and Defendants from April 16, 2025, through May 24, 2025, consists of documented exchanges, with Defendant Crisalli providing only four brief responses while Plaintiff continued reporting ongoing smoking violations that Defendant Crisalli had secretly authorized.

70. Defendants' April 28, 2025 request for an in-person meeting to "*discuss the ongoing situation*" regarding smoking violations was a calculated deception designed to maintain their false narrative, as the Defendant Crisalli had already secretly modified the smoking so how would he permit the very conduct Plaintiff was reporting, making any "*discussion*" about enforcement meaningless while creating the false impression that Defendant were actively addressing violations they had actually authorized.

71. Defendant Crisalli's insistence on meeting "*in person*" rather than accepting Plaintiff's reasonable offer for a conference call was intended to control the narrative and prevent Plaintiff from obtaining documentation of their admissions, while the Owner was fully aware that no enforcement action would be taken because he had already accommodated the smoking through property policy modifications that remained hidden until May 23, 2025.

72. Defendant Crisalli's meeting request constituted *fraudulent misrepresentation*, as Defendants solicited Plaintiff's time and participation in discussions about stopping smoking violations while concealing the *material fact* that they had no intention of enforcement because smoking had been secretly authorized, demonstrating a *deliberate* intent to deceive Plaintiff about their enforcement capabilities and intentions.
73. Following nearly a month of unanswered reports, Plaintiff kindly approached the explicitly smoking neighbor on May 23, 2025, who stated that Defendant Crisalli modified his lease to permit smoking, revealing the calculated and deceptive nature of Defendants' conduct while Plaintiff continued reporting violations Crisalli had already authorized.
74. This case presents issues of broader *public health* significance and SEC reporting, requiring Federal Court jurisdiction to establish precedent for protecting vulnerable populations when existing protections prove inadequate against systematic property owner fraud that deliberately circumvents legal safeguards for residents and investors of these properties.
75. The cruel nature of Defendants conduct lies in the knowledge that Plaintiff's complaints were *futile* because smoking had already been officially authorized through systematic fraud.

## REPORTING THE SMOKING POLICY VIOLATIONS TO CRISALLI

76. Plaintiff documented text messages to Defendant Crisalli showing limited investment owner and property operations responses to the explicit violations detailed:

1. TEXT REPORTING - April 16, 2025 12:52 PM
2. PROPERTY RESPONSE- April 16, 2025 12:55 PM
   Maintenance will investigate.
3. PLAINTIFF RESPONSE- April 16, 2025 1:13 PM
4. TEXT REPORTING - April 20, 2025 9:43 AM
5. TEXT REPORTING - April 24, 2025 8:56 AM
6. PROPERTY RESPONSE- April 24, 2025 9:25 AM
   Thank you for reporting concerns. We will investigate and address the issue with the appropriate parties.
7. PLAINTIFF RESPONSE- April 24, 2025 9:26 AM
8. TEXT REPORTING - April 25, 2025 2:56 PM
9. PROPERTY RESPONSE- April 28, 2025 3:11 PM
   We understand your concerns regarding smoking. We are wondering if you are available for a sit-down meeting with ownership and management to discuss the ongoing situation on Wednesday late morning time?
10. PLAINTIFF RESPONSE- April 28, 2025 5:46 PM (Unsure of schedule)
11. PLAINTIFF RESPONSE- April 28, 2025 5:47 PM (Unsure of schedule)
    I can do a conference call as well [Plaintiff had no idea why a sit-down meeting was needed for the Defendant to enforce the non-smoking policy].
12. TEXT REPORTING - April 29, 2025 6:49 AM
13. PROPERTY RESPONSE- April 29, 2025 6:51 AM
    Please let us know your availability as soon as you can, we look forward to meeting in person.
14. PLAINTIFF RESPONSE- April 29, 2025 10:44 AM
    Please address the ongoing smoking violations as this doesn't req immed mtg with me as I have no authority to stop the violations from [Unit left of me] & [Unit right of me]
15. TEXT REPORTING - April 29, 2025 1:20 PM
16. TEXT REPORTING - April 29, 2025 2:17 PM
17. TEXT REPORTING - April 30, 2025 3:30 PM
18. TEXT REPORTING - May 2, 2025 4:39 AM
19. TEXT REPORTING - May 2, 2025 4:40 AM
20. TEXT REPORTING - May 3, 2025 4:51 AM
21. TEXT REPORTING - May 3, 2025 9:25 AM
22. TEXT REPORTING - May 5, 2025 6:09 AM
23. TEXT REPORTING - May 5, 2025 10:41 AM
24. TEXT REPORTING - May 10, 2025 5:21 PM
25. TEXT REPORTING - May 10, 2025 5:38 PM [correction unit]
26. TEXT REPORTING - May 13, 2025 3:56 AM
27. TEXT REPORTING - May 17, 2025 5:32 AM
28. TEXT REPORTING - May 17, 2025 7:50 AM
29. TEXT REPORTING - May 18, 2025 7:01 AM
30. TEXT REPORTING - May 18, 2025 8:58 AM
31. TEXT REPORTING - May 19, 2025 1:58 AM
32. TEXT REPORTING - May 21, 2025 8:12 AM
33. TEXT REPORTING - May 22, 2025 4:43 AM
34. TEXT REPORTING - May 22, 2025 6:59 AM
35. TEXT REPORTING - May 22, 2025 12:21PM
36. TEXT REPORTING - May 23, 2025 4:02 AM [finally went to meet with the neighbor who was smoking and he confirmed my worst nightmare, the Owner had modified his lease to allow him to smoke as my text reports went unanswered for almost a month before realizing the cruelty]
37. TEXT REPORTING - May 24, 2025 10:46 AM

## PARTIES

77. Plaintiff Susan Keith is an individual who resides at said property within the County of Onondaga and State of New York.

78. Plaintiff is a former international Project Manager with extensive experience in financial regulatory and compliance projects. She holds an MBA in International Business (1994), degrees in Computer Systems and Finance (1989), training in non-profit legal advocacy and research, and government internship experience in accounts and control. She is also a Fellow of the Life Management Institute (FLMI) (1994) through LOMA (Life Office Management Association) and a PMI (Project Management Institute) certified project manager.

79. Defendant Ozario Crisalli is an individual residing within the State of New York who serves as co-owner of Syracuse Realty Group, LLC, the property management company for the subject premises, and co-owner and co-executive officer of QP2 Properties, LLC (CIK 0001983557), a SEC-registered real estate investment entity operating a $5,000,000 investment offering that owns the subject premises and is subject to federal securities disclosure requirements.

80. Defendant Erin Condon is an individual who resides within the State of New York and serves as Property Manager for the subject premise as an agent for Syracuse Realty Group, LLC and QP2 Properties, LLC, a SEC-regulated real estate investment operations.

## JURISDICTION AND VENUE

81. This Court has subject matter jurisdiction pursuant to 28 U.S.C. Section 1331 as this action arises under federal securities laws, including violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5, and Section 17(a) of the Securities Act of 1933.

82. This Court has supplemental jurisdiction over related state law claims pursuant to 28 U.S.C. Section 1367.

83. This Court has personal jurisdiction over Defendants as they conduct business affecting interstate commerce through management of a SEC-registered investment entity funded by interstate investor capital.

84. Venue is proper pursuant to 28 U.S.C. Section 1391(b)(2) as the events giving rise to this action occurred within the Northern District of New York.

**FACTUAL ALLEGATIONS**

85. On December 20, 2024, Plaintiff entered into a leasing contract with QP2 Properties, LLC, for a unit in this luxury residential property—which was contractually designated as a non-smoking property and managed and/or co-owned by Defendants—after detailed conversations with the leasing agent, Justin Surlock, in October 2024 regarding her health requirements and smoking policy enforcement requirement—during which the leasing agent explicitly confirmed that the no-smoking policy covers the entire structure and patio, assured Plaintiff that the policy would be enforced—with these assurances re-affirmed in December 2024—thereby inducing Plaintiff's reliance on these repeated representations in selecting this premier property based on the contractual guarantee of a smoke-free living environment.

86. From December 20, 2024, through March 2025, for approximately three months after moving in, the non-smoking policy was effectively enforced by Defendants management—and Plaintiff enjoyed the promised smoke-free living environment as contractually guaranteed—with no incidents of tobacco smoke, vaping, and/or marijuana infiltration, secondhand smoke exposure, or violations of the property's non-smoking designation, thereby establishing Defendants clear capability to enforce the policy and creating Plaintiff's reasonable expectation that such enforcement would continue throughout the lease term.

87. By April 4, 2025, secondhand smoke was infiltrating Plaintiff's unit on a regular basis, and Plaintiff promptly reported specific incidents to Defendants with dates, times, and locations—beginning with Plaintiff's first reporting of the violations on April 4, 2025, by calling the office and leaving a message at approximately 5:00 PM, during which the

person who answered stated the call would be automatically connected to one of the owner's voicemail—but no follow-up or response to the message ever occurred, establishing the beginning of Defendants pattern of deliberate indifference to smoking violations that would later be revealed as intentional concealment of Defendant Crisalli's secret authorization of the very conduct Plaintiff was reporting.

88. On April 30, 2025, Defendant Crisalli sent Plaintiff a message requesting a virtual call to address concerns, but despite Plaintiff's immediate response with complete availability—providing both phone numbers and expressing willingness to discuss the smoking violations—management never scheduled or conducted this call, establishing a pattern of feigned concern followed by deliberate silence that would later be revealed as intentional concealment after Plaintiff discovered on May 23, 2025, that Defendant Crisalli had secretly authorized the very smoking violations Plaintiff was reporting, thereby demonstrating that the offer to discuss concerns was fraudulent misrepresentation designed to pacify Plaintiff while management knowingly permitted conduct that would continue to impact the health of all residents, including Plaintiff.

89. On May 15, 2025, after receiving no responses to the reported violations for a period of two weeks, Plaintiff suspected that Defendants—knowing of Plaintiff's health concerns—were intentionally allowing her health to be compromised and attempting to force her to voluntarily surrender her lease, which suspicion was confirmed when Plaintiff decided to test this hypothesis and gauge their reaction by submitting a notice to vacate—which was responded to and approved immediately without dispute—thereby demonstrating Defendants' awareness of the breach and deliberate attempt to create conditions so

intolerable that Plaintiff would voluntarily leave, constituting constructive eviction under New York State law through fraudulent means.

90. On May 16, 2025, after no action regarding the smoking violations and the obvious intention to harm Plaintiff's health, Plaintiff submitted a legal notice to facilitate compliance—whereupon the entire area was suddenly and thoroughly refreshed with no tobacco or smoke fumes present for the first time in over a month—thereby demonstrating Defendants' capability to enforce policy when faced with legal consequences.

91. On May 16, 2025, another resident living in an adjoining unit provided information confirming the smoking violations Plaintiff had been reporting to Defendants, stating that the new resident *"explicitly smokes"* and that *"you can smell it in the hallway,"* thereby providing independent corroboration that the smoking violations were affecting multiple units and creating the exact habitability issues Plaintiff had been documenting in her reports to Defendants—with this resident confirming that residents had only received their single notice regarding smoking violations *"a couple of days ago"*—which was the first such notice despite Plaintiff's numerous prior complaints dating back to April—where fumes appeared to come from two different units with smoking observed at both locations—however, one unit was far more explicit in its violations than the other but both were equally poisonous and harmful to Plaintiff's, all residents, health and safety—demonstrating Defendants systematic failure to enforce the non-smoking policy while secretly authorizing the very conduct other residents were now being warned about, with Defendant Condon subsequently telling Plaintiff about three weeks later on June 12, 2025, that she was receiving reports that Plaintiff was causing concern to other residents, when in fact it was normal courtesy communications.

92. On May 18, 2025, Defendant Crisalli was notified via text of smoke infiltration around 6:00 AM at Plaintiff's home and ignored this report and the 911 notification by Plaintiff—when the infiltration intensified between 8:00 and 9:00 AM, Plaintiff—having experienced these near-fainting symptoms from the fumes previously but now alarmed and fearful for her safety—called 911 due to safety concerns, with emergency responders noting elevated blood pressure requiring multiple readings that subsided after Plaintiff recovered in the ambulance away from her home—with paramedics hypothesizing that these fumes may have contained other chemical additives, indicating these were not only tobacco smoke but chemically enhanced substances that posed additional health risks beyond traditional cigarette smoke—as the explicit authorization of the new resident's by Crisalli created a cascading effect whereby previously non-smoking neighbors also began smoking, further intensifying the infiltration problem.

93. On May 18, 2025, Plaintiff notified Defendant Crisalli via the emergency text number provided—which Plaintiff learned from his nuclear email on June 12, 2026 was his personal mobile number—of the fumes by writing in a text at 8:58 AM *"The indoor smoking continues []. Please address as I am ill"* and received no response, demonstrating Defendant Crisalli's deliberate indifference to Plaintiff's immediate health crisis despite having direct notice through his personal emergency contact line.

94. Continuing at 8:58 AM on May 18, 2025, Plaintiff urgently texted Defendant Crisalli: *"Please address. The paramedics arrived and checked my vitals as I felt too dizzy but after being out they were able to wait for BP to stabilize. The smoking continued"*—yet this text was ignored by Defendant Crisalli despite clear notification that emergency medical intervention was required due to his failure to address the smoking violations—

conduct that is particularly cruel and egregious given that Defendant Crisalli sits on the board of Helio Health Foundation while simultaneously endangering a resident's health—and that just five days later Plaintiff would learn that he had authorized the smoking violations for a new resident who had moved in either late March or early April per the residents' statement on May 23 to Plaintiff—with this authorization potentially motivating previous smoke-free neighboring resident to begin having someone smoke at their residence by mid-April, as observed by Plaintiff when she saw him smoking on their patio—thereby creating a toxic environment on both sides of Plaintiff's unit where she could find no respite even when one resident temporarily left for his other home—demonstrating that Defendant Crisalli's authorization of smoking violations created a cascading effect prompting others to smoke, that exponentially increased Plaintiff's chemical exposure and health risks, directly causing the May 18, 2025 medical emergency requiring paramedic intervention.

95. On May 23, 2025, after continued smoke infiltration and resulting health symptoms, Plaintiff spoke directly with the explicitly smoking neighbor who revealed that Defendant Crisalli had officially changed his lease agreement to permit smoking despite the property's non-smoking status—thereby exposing that Defendant Crisalli's silence and refusal to respond to Plaintiff's emergency pleas for help on May 18, 2025, including ignoring texts sent while paramedics were treating Plaintiff for smoke-induced medical distress, was not mere negligence but deliberate and calculated indifference designed to conceal his knowing authorization of the very conduct causing Plaintiff's health crisis—conduct that constitutes gross negligence, intentional infliction of emotional distress, and fraudulent concealment by a property manager who simultaneously serves on a health

foundation board while secretly permitting resident conduct he knew would harm another resident's health and safety.

96. On May 25, 2025, after Plaintiff placed a courtesy note on a neighbor's door regarding smoking issues after becoming very ill again from the fumes which are different in composition than the other smoke fumes, the neighbor voluntarily approached Plaintiff several hours later when she saw Plaintiff leaving her garage and initiated a lengthy conversation while Plaintiff was holding her grocery bags—during which the neighbor initially denied any smoking at her unit, discussed dog barking issues, and spoke about possibly being blamed for another neighbor's barking dog—whereupon Plaintiff mentioned seeing someone come out of this neighbor's unit smoking about two weeks after the new resident's smoking started—with Plaintiff thinking that others probably thought smoking was *OK now since the new resident outwardly smokes and the smell is in the building and then cleaned to cover it up*—and the neighbor then acknowledged the smoking pattern and provided detailed information, including that *"he"—referring to a visitor who had been smoking in and out of their home—"hasn't been there in a while"*—yet not until *June 12, 2025*, eighteen (18) days later, did Defendant Condon attempt to falsely characterize this interaction as causing concern to other residents, who had approach me to discuss in detail the courteous note, and that Plaintiff has no right to speak to other residents—however, when Plaintiff asked this neighbor to clarify while talking to Defendant Condon by phone, the neighbor confirmed she had told Defendant Condon about the note but stated she had not wanted to get involved with the smoking matter—whereupon Defendant Condon attempted to deflect by claiming *"I didn't tell you it was [that neighbor],"* which was obviously false since Plaintiff had only spoken to *two units'*

*neighbors* during the entire ten-week period—thereby exposing Defendant Condon's fabricated allegations as calculated retaliation designed to discredit Plaintiff's legitimate resident communications.

97. Had there been any genuine complaint from the neighbor, Defendant Condon as property manager would have addressed such concerns with Plaintiff immediately upon receiving them, as required by standard property management protocols—however, Defendant Condon only raised these alleged concerns for the first time on *June 12, 2025*, precisely when Plaintiff inquired about the promised follow-up teleconference regarding smoking violations—demonstrating that the purported neighbor complaint was fabricated documentation created specifically to deflect from Defendants' failure to address the smoking violations and to retaliate against Plaintiff for continuing to assert her habitability rights—with the timing of this manufactured allegation eighteen (18) days after the May 25, 2025 interaction revealing Defendant Condon's calculated use of false documentation to shift blame onto Plaintiff and create pretextual justification for avoiding her smoking violation enforcement obligations, consistent with Defendants' established pattern of used fabricated maintenance reports and coordinating false claims whenever confronted about their systematic breach of lease obligations.

**SUMMARY REPORTING OF SMOKING HARM TO DEFENDANT CRISALLI**

98. *April 16, 2025 Initial Response Text Pattern:* On April 16, 2025, at 12:52 PM, Plaintiff reported smoking violations infiltrating her unit via text to Defendant Crisalli—and received a response at 12:55 PM stating *"Maintenance will investigate"*—to which Plaintiff responded at 1:13 PM, establishing an initial pattern where Defendant provided superficial acknowledgment of smoking violations while secretly knowing that such violations were authorized conduct that would not be addressed, thereby demonstrating fraudulent misrepresentation designed to pacify Plaintiff's legitimate health and safety concerns.

99. *April 24, 2025 False Assurances:* On April 24, 2025, at 8:56 AM, Plaintiff reported smoking violations infiltrating her unit via text to Defendant Crisalli—and received a response at 9:25 AM stating *"Thank you for reporting concerns. We will investigate and address the issue with the appropriate parties"*—to which Plaintiff responded at 9:26 AM, yet this promise to *"address the issue with the appropriate parties"* was knowingly false since Defendant Crisalli had already authorized the smoking violations and had no intention of stopping conduct he had permitted, constituting deliberate misrepresentation and fraudulent concealment of material facts in SEC-registered real estate investment entity.

100. *May 2-23, 2025 Escalating Silence and Cruelty:* From May 2, 2025, through May 24, 2025, Plaintiff sent approximately twenty (20) additional text reports of smoking violations infiltrating her unit to Defendant Crisalli—including urgent reports on May 18, 2025, at 7:01 AM and 8:58 AM during her medical emergency—yet received no responses whatsoever, with this cruel silence finally explained when Plaintiff discovered on May 23,

2025, at 4:02 AM, after speaking directly with the smoking neighbor, that Defendant Crisalli had modified the property police for this resident to permit smoking, thereby revealing that nearly a month of ignored pleas for help were deliberate and calculated indifference designed to conceal Defendant's authorization of the very conduct causing Plaintiff's documented health crises.

101. *May 24, 2025 Post-Discovery Documentation:* On May 24, 2025, at 10:46 AM, Plaintiff reported smoking violations infiltrating her unit via text to Defendant Crisalli—receiving no response—but this final text report was sent with the devastating knowledge that Defendant Crisalli had secretly authorized the smoking violations, transforming this communication from a plea for help into documentation of ongoing harm that Defendant was knowingly permitting, thereby establishing that even after Plaintiff's discovery of the fraudulent scheme, Defendant Crisalli continued his pattern of deliberate silence while maintaining authorization for conduct he knew was causing Plaintiff's health concerns and rendering her living conditions intolerable.

102. *Defendant's Concealment and Technical Knowledge Contradiction:* On June 12, 2025, during Plaintiff's second phone conversation with Defendant Condon since April—when Condon had first inquired whether Plaintiff would move to an upper unit rather than have the smoking policy enforced, to which Plaintiff responded she would first rather have the policy enforced because smoke travels—Defendant demanded to know *"how"* smoke was entering Plaintiff's unit—demonstrating her awareness that smoke infiltration was occurring while attempting to shift focus away from the authorized smoking accommodation she had concealed—with Defendant Condon's questioning revealing her technical knowledge of smoke infiltration methods that contradicted her previous claims

of enforcement difficulty, thereby establishing Condon's fraudulent misrepresentation regarding her ability to address smoking violations and her deliberate concealment of material facts that rendered Plaintiff's unit uninhabitable.

103. *Defendant's Fraudulent Denial of Alternative Accommodations:* On June 12, 2025, when Plaintiff—now knowing that to remain in her community she would have to transfer though this was not her preferred option—requested to transfer to another unit as far as possible from the authorized smoker—having now learned that Defendants had authorized the smoking accommodation and it would not cease—Defendant Condon claimed no units were available—yet simultaneously stated she had been conducting *"showings daily"* for available units—demonstrating fraudulent conduct and breach of the covenant of quiet enjoyment as Defendants knew alternative accommodations existed but refused to provide them to avoid honoring the non-smoking lease terms, thereby forcing Plaintiff to remain in uninhabitable conditions or voluntarily cease her lease agreement while maintaining the profitable smoking accommodation that violated Plaintiff's lease rights and denying Plaintiff the very relocation option Defendant Condon had previously suggested when seeking to avoid enforcement and allow the authorized change in property status by Defendant Crisalli.

104. *Defendant's Retaliatory False Allegations:* On June 12, 2025, Defendant Condon falsely stated that she was receiving "*daily reports*" of Plaintiff speaking to other residents—attempting to imply misconduct when in fact only two units in the entire building had been contacted by Plaintiff regarding smoking violations affecting her habitability—with this demonstrably false characterization constituting retaliatory conduct designed to discredit Plaintiff's legitimate resident communications and create pretextual justification for

restricting Plaintiff's rights in response to her discovery of Defendants unauthorized smoking accommodation that Defendant Condon had concealed since April when she first attempted to deflect enforcement through relocation suggestions.

105. *Defendant's Systematic Retaliation Through Communication Restrictions:* On June 12, 2025, following Plaintiff's challenge to Defendant Condon's false statements and evidence of the authorized smoking accommodation that Defendant Condon had concealed since April, Defendant Condon coordinated with Defendant Crisalli to send a retaliatory email implementing company-wide communication restrictions—falsely claiming Plaintiff was *"tying up the time of every employee"* when Plaintiff had minimal contact with property management—demonstrating systematic retaliation, interference with Plaintiff's right to report habitability violations, and calculated intimidation designed to prevent further evidence gathering regarding Defendant's fraudulent conduct and unauthorized material modification to the property policy that had been concealed throughout the enforcement period.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION: 15 U.S. CODE SECTION 78J - MANIPULATIVE AND DECEPTIVE DEVICES

## INVESTMENT PROPERTY FRAUD

106. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

107. This action follows the established precedent where the Securities and Exchange Commission successfully prosecuted a real estate investment company owner for defrauding investors through false representations about property operations, material omissions regarding underlying operational problems, and systematic concealment of conduct that threatened investment safety—demonstrating that property management fraud affecting investors constitutes securities fraud subject to federal jurisdiction and enforcement under federal securities antifraud provisions.

108. Defendant Crisalli operates this brand-new luxury residential property using investor capital and tax credits, while systematically concealing material information from investors regarding property operations, management practices, and substantial litigation exposure created through his fraudulent conduct.

109. Upon information and belief, Defendants made material misrepresentations to investors regarding property characteristics—specifically marketing and operating properties as non-smoking facilities while secretly authorizing smoking accommodations that violate the marketed specifications—with this discriminatory scheme designed to increase occupancy by targeting residents Defendants deemed expendable while concealing from investors the substantial civil rights liability exposure and regulatory violations created through this systematic pattern of resident discrimination and abuse.

110. Upon information and belief, Defendants breached their fiduciary duty to investors by using investor capital to operate properties through systematic resident abuse, civil rights violations, and regulatory non-compliance while concealing these material risks that directly threaten investment safety and property values.

111. Upon information and belief, Defendant Crisalli's management of investor funds while simultaneously serving on the Helio Health Foundation board—using his son's overdose death to gain credibility while authorizing carcinogenic exposure to residents—constitutes fraudulent misrepresentation of management character and material investment decisions.

112. Upon information and belief, Defendants failed to disclose to investors the substantial litigation exposure created through their documented pattern of resident retaliation, constructive removal through fraud, fraudulent concealment, and systematic violation of resident rights, all of which constitute material information requiring disclosure under federal securities law.

113. Defendants' use of $1.3 million in taxpayer-funded benefits to operate a property that deliberately expose residents to EPA Class A carcinogens while concealing this conduct from investors constitutes investment advisor fraud and breach of fiduciary obligations.

114. As a direct and proximate result of Defendants' investment property fraud, Plaintiff has suffered damages including but not limited to medical expenses, relocation costs, lost property rights, and exposure to ongoing health risks, and investors face substantial undisclosed liability exposure requiring immediate SEC disclosure and regulatory intervention.

**SECOND CAUSE OF ACTION: FRAUDULENT MISREPRESENTATION**

115. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

116. In New York, to prove fraudulent misrepresentation, a plaintiff must establish several key elements.

117. These include a material misrepresentation of a fact, knowledge of its falsity by the defendant, intent to induce reliance, justifiable reliance by the plaintiff, and resulting damages.

118. Courts consistently apply these elements across various contexts, demonstrating to allege a cause of action based on fraud, a plaintiff must assert "a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury".

119. Defendant Condon made material false representations of fact to Plaintiff regarding her inability and efforts to enforce the property's non-smoking policy while Defendant Crisalli simultaneously and secretly authorizing the very conduct that violated Plaintiff's lease agreement, satisfying the material misrepresentation element.

120. Specifically, Defendant Condon falsely represented that: (a) she was attempting to address and resolve smoking violations affecting Plaintiff's unit; (b) she lacked the ability or authority to effectively stop smoking activities; (c) she was following standard enforcement protocols and procedures; (d) she was acting in good faith to honor the non-smoking lease provisions; (e) she was unable to control smoking when she had, in fact, deliberately amended lease terms to permit such conduct; f. Enforcement of smoking

violations was *difficult* requiring complex eviction procedures; and (g) she needed to meet with Plaintiff in person to address violations when this was pure delay tactic.

121. These representations were false when made, as Defendant Condon possessed full knowledge that Defendant Crisalli had officially authorized smoking activities through lease modifications while simultaneously claiming to Plaintiff they were attempting enforcement.

122. Defendant Condon knew these representations were false at the time they were made, or made them with reckless disregard for their truth, as evidenced by: (a) her secret knowledge of lease terms to permit smoking authorized by Defendant Crisalli, while claiming enforcement difficulties; (b) her technical knowledge of smoke infiltration methods revealed during June 12, 2025, conversation; (c) her pattern of offering meetings and solutions with Defendant Crisalli she never intended to implement; (d) her deliberate choice to accommodate violators with Defendant Crisalli rather than honor Plaintiff's contractual rights; and (e) her coordination with the on-site maintenance employee, Brandon Crandall, to use fabricated false reports supporting her deceptive narrative.

123. Defendant Condon's June 12, 2025, conversation with Plaintiff revealed the calculated nature of her fraudulent misrepresentations when she: (a) demanded to know "*how*" smoke was entering Plaintiff's unit, revealing her knowledge that infiltration was occurring; (b) demonstrated technical understanding of smoke infiltration that contradicted her previous claims of helplessness; (c) deflected inquiry about smoking accommodations by claiming it was "*none of [Plaintiff's] business*"; and (d) falsely claimed no units were available for transfer while admitting to "*daily showings*" of available units.

124. Defendant's fraudulent misrepresentations extended to coordinating fabricated maintenance reports designed to support her false narrative, including: (a) collaborating with the on-site maintenance employee, Brandon Crandall, to use false reports blaming Plaintiff for a defective washer; (b) fabricating claims that Plaintiff failed to follow maintenance procedures that were never provided; (c) creating false documentation to shift blame for habitability violations onto Plaintiff; and (d) aiding Defendant Crisalli in using fabricated reports to demand payment for a replacement washer that was not repaired properly in order to justify service restrictions as retaliation.

125. Defendant Condon made these false representations with the intent to deceive Plaintiff while she systematically undermined the lease agreement, specifically to: (a) prevent Plaintiff from pursuing immediate legal remedies; (b) create delay while she solidified her accommodation of smoking residents with Defendant Crisalli; (c) maintain rental income while making the situation unbearable to constructively remove Plaintiff through uninhabitable conditions; (d) conceal her deliberate breach of contract behind a facade of good faith enforcement efforts with Defendant Crisalli; and (e) use false documentation to use against Plaintiff in anticipated legal proceedings.

126. Plaintiff justifiably relied on these misrepresentations by: (a) continuing to report violations based on Defendant's promises of resolution to Defendant Crisalli; (b) delaying legal action in reliance on Defendant's claimed enforcement efforts as retaliation was a major concern; (c) participating in providing availability for a teleconference meeting that Defendants never intended to complete; (d) believing Defendant Condon's representations that she was attempting to honor lease obligations when she was deliberately undermining

them; and (e) accepting Defendant Condon's claims of enforcement difficulty rather than investigating the true nature of authorized accommodations by Defendant Crisalli.

127. As a direct and proximate result of Defendants fraudulent misrepresentations, Plaintiff suffered substantial damages, including: (a) prolonged exposure to uninhabitable conditions that could have been avoided through immediate legal action requesting Injunctive relief; (b) severe health impacts requiring emergency medical intervention; (c) emotional trauma from discovering the deceptive nature of Defendants conduct; (d) future relocation expenses necessitated by Defendants fraud; (e) damages from their attempt at making the situation so inhabitable that Plaintiff would voluntarily leave which Plaintiff confirmed when ignored and submitted a Notice to Vacate to determine if she was correct and they immediately wanted to approve it which constitutes constructive eviction in New York state, accomplished through fraudulent means; (f) costs of future medical treatment and smoke mitigation measures; (g) loss of time and resources pursuing resolution based on Defendants false promises; and (h) financial penalties imposed through fabricated maintenance reports and false payment threats.

128. Defendant Condon's fraudulent conduct escalated on June 12, 2025, when confronted with evidentiary proof in a statement from one of the smokers of her authorized smoking accommodation, leading to: (a) false implications that Plaintiff was speaking to residents and should not speak to others indicating that the courteous note through legitimate habitability communications was a concern; (b) fabricated claims of receiving *daily reports* about Plaintiff when only two units had been contacted and the daily reports were reporting the violations appropriately via text or email, which Plaintiff had recently given up on regular reporting after finding out on May 23 that this was all a fraud; (c)

coordination of retaliatory communication restrictions through Defendant Crisalli to prevent further evidence gathering; and (d) false claims about unit availability designed to prevent Plaintiff from obtaining an alternative resolution.

129. Defendants conduct constitutes fraud in the performance of lease obligations, as they induced Plaintiff's continued occupancy until the rental market began to pick up and through material misrepresentations while secretly undermining the fundamental terms of the lease agreement.

130. The systematic nature of Defendants fraudulent misrepresentations, combined with their coordination of fabricated evidence and retaliatory conduct, demonstrates a calculated campaign of deception designed to conceal the breach of contract while forcing Plaintiff's to adopt a voluntarily constructive removal.

131. The damages suffered by Plaintiff exceed the jurisdictional limits of lower courts and warrant punitive damages due to the deliberate and deceptive nature of Defendants conduct, including her fabrication of false maintenance reports and coordination of retaliatory restrictions.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, consequential damages, punitive damages, costs, pre- and post-judgment interest, and such other relief as this Court deems just and proper.

**STATUTORY VIOLATIONS UNDER NEW YORK'S DECEPTIVE PRACTICES ACT**

132. Defendants conduct also constitutes violations of New York's Deceptive Practices Act, which prohibits deceptive acts or practices in the conduct of any business, trade or commerce.

133. Defendant Condon's systematic misrepresentations, concealment of authorized smoking accommodations, and suppression of material facts regarding lease modifications, authorized by Defendant Crisalli, constitute deceptive practices under New York's Deceptive Practices Act as she engaged in: (a) misrepresentation of her enforcement capabilities and efforts; (b) concealment of the authorized smoking accommodation that rendered enforcement impossible; (c) suppression of material facts regarding lease modifications affecting Plaintiff's habitability; and (d) false advertising of the property as non-smoking while secretly permitting smoking.

134. Defendants false advertising of the property as non-smoking while maintaining secret smoking accommodations also violates New York Deceptive Practices Act, which specifically addresses false advertising in business transactions.

135. These deceptive practices were conducted in the ordinary course of Defendants business and directly affected Plaintiff as a consumer of residential rental services.

136. Defendants violations entitle Plaintiff to injunctive relief requiring cessation of deceptive practices and monetary damages for the harm.

137. The systematic nature of Defendants deceptive conduct, spanning months of false representations while secretly authorizing the conduct they claimed to be preventing, warrants both compensatory and punitive relief under New York's Deceptive Practices Act.

## THIRD CAUSE OF ACTION: INTENTIONAL BREACH OF CONTRACT

138. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

139. Plaintiff and an agent for Defendant Crisalli entered into a valid and binding lease agreement on December 20, 2024, which explicitly included and incorporated the property's non-smoking policy as a material term of the tenancy.

140. The property was expressly marketed and advertised as a "non-smoking" property, which was a material inducement for Plaintiff to enter into the lease agreement and justified the premium rental rate.

141. During Plaintiff's extensive pre-leasing conversations with the leasing agent, Plaintiff specifically emphasized the critical importance of a strictly enforced non-smoking environment due to health concerns, and these representations formed a material basis for Plaintiff's decision to sign a lease at this premium property which had a very low occupancy during this time of an intense winter.

142. When Plaintiff emphasized the extensive conversation with the leasing agent regarding the explicit *No Smoking Policy* during the June 12, 2025 conversation with Defendant Condon, she stated *"well, I'll talk to him,"* dismissing the foundational lease terms while revealing coordination between property management staff.

143. Defendant Condon's dismissive response was particularly revealing as the leasing agent didn't respond to Plaintiff's email about the issue and request for other alternative units and Defend Condon did not dispute this failure to respond, demonstrating coordinated avoidance of the smoking violation issue among property management staff especially

when Defendant Crisalli's emailed demanded Plaintiff only communicate with him going forward.

144. The non-smoking provision was a material term of the lease agreement as evidenced by: (a) the property's explicit marketing as a *non-smoking* luxury residence; (b) the premium rental rate charged in part due to this feature; (c) the specific inclusion of non-smoking provisions in the lease; (d) Plaintiff's explicit discussion of the importance of this feature prior to signing; (e) the property's designation as a luxury residential facility where policy enforcement was expected to be comprehensive; and (f) Defendant Condon's own acknowledgment of the extensive pre-leasing conversations about the no-smoking policy.

145. Defendants intentionally breached the lease agreement by deliberately choosing to accommodate smoking residents rather than enforce the contractual non-smoking terms, specifically by: (a) authorizing amendment of a neighboring resident's lease to officially permit smoking activities that directly compromised Plaintiff's unit habitability; (b) failing to effectively enforce the non-smoking policy while misrepresenting enforcement efforts; (c) failing to promptly and adequately respond to Plaintiff's multiple reports of smoking violations; (d) coordinating with leasing staff to avoid addressing smoking violations, as evidenced by Plaintiff's statement that the leasing agent failed to respond to Plaintiff's emails about the issue and Defendant Condon failure to dispute this coordinated avoidance; (e) choosing to authorize smoking rather than honor existing lease obligations; and (f) deliberately creating uninhabitable conditions.

146. This breach was intentional rather than negligent, as demonstrated by Defendant Crisalli's deliberate decision to modify lease terms to permit the conduct that breached Plaintiff's

agreement, while simultaneously misrepresenting enforcement capabilities and intentions to Plaintiff.

147. Defendants coordination with other property management staff to avoid addressing the smoking violations, as revealed by Plaintiff's statement that the leasing agent failed to respond to Plaintiff's emails about the issue and Defendant Condon's non-denial of this coordinated avoidance, demonstrates systematic avoidance of contractual obligations rather than good faith attempts at enforcement.

148. This breach was substantial and material, going to the essence of the lease agreement, as the non-smoking environment was a fundamental aspect of the property for which Plaintiff agreed to and which formed the basis of Plaintiff's tenancy health decision for a brand-new property as Plaintiff had declined the other new property available at that time.

149. Defendant's intentional breach directly caused Plaintiff to suffer damages, including but not limited to: (a) loss of the contracted-for benefit of a non-smoking living environment; (b) diminution in value of the leasehold; (c) costs associated with mitigating smoke infiltration; (d) change of her home that will be necessitated by Defendants breach to prevent further health implications; (e) severe health impacts from exposure to secondhand smoke requiring emergency medical intervention; (f) forcing Plaintiff's to volunteer to give up her unit by not enforcing the contract which is considered, under New York Law, Constructive eviction through fraud; (g) emotional trauma from discovering the fraudulent nature of Defendants conduct; and (h) additional damages from coordinated avoidance of contractual obligations by property management staff.

150. Despite Plaintiff's repeated notices to Defendants regarding these ongoing breaches, Defendants chose to accommodate violators rather than enforce Plaintiff's contractual

rights, while coordinating with other staff to avoid addressing the fundamental breach of lease terms.

151. As a direct and proximate result of Defendants intentional and material breach of the lease agreement, Plaintiff has suffered damages in an amount to be determined at trial, but exceeding the jurisdictional limits of lower courts.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, consequential damages, punitive damages, costs, pre- and post-judgment interest, and such other relief as this Court deems just and proper.

## FOURTH CAUSE OF ACTION: BREACH OF THE WARRANTY OF HABITABILITY

152. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

153. Under New York Real Property Law Section 235-b, Plaintiff was entitled to be free from conditions that substantially interfere with health, safety, and comfort.

154. The persistent infiltration of secondhand smoke—classified as a Class A carcinogen by the EPA—created uninhabitable conditions that were deliberately maintained and exacerbated by Defendant Crisalli's secret authorization of smoking activities while Defendant Condon misrepresented her enforcement efforts to Plaintiff.

155. These uninhabitable conditions were not the result of negligent enforcement but of Defendants intentional decision to accommodate smoking residents through lease modifications while fraudulently claiming inability to address violations, thereby deliberately creating and maintaining the hazardous environment.

156. The infiltration of secondhand smoke constitutes a breach of the warranty of habitability as recognized by New York courts holding that an owner's failure to address secondhand smoke traveling between units constitutes a violation of New York's warranty of habitability law; New York Court ruling that an owner violated the warranty of habitability when secondhand smoke from one resident's apartment was allowed to infiltrate another's, entitling the non-smoking resident to rent reduction; New York courts establishing that a private nuisance cause of action can be brought by a resident against an owner for secondhand smoke conditions.

157. Despite Plaintiff's immediate documentation and reporting of smoking violations, good faith attempts to work with management toward resolution, and ongoing efforts to mitigate

the uninhabitable conditions through constant cleaning, laundering of personal belongings, and air purification measures, Defendants deliberately maintained the hazardous environment.

158. Plaintiff's diligent efforts to address the habitability violations included: (a) immediate initial reporting of each smoking incident with specific dates, times, and locations; (b) repeated attempts to engage with Defendants through their proposed communication channels; (c) constant cleaning and washing of personal belongings contaminated by smoke infiltration; (d) ongoing air purification equipment and other mitigation measures; (e) planned participation in Defendant's virtual call meeting that were never implemented; (f) providing complete availability for the resolution call that Defendants never scheduled; and (g) attempting to work through proper channels with the leasing agent who failed to respond to Plaintiff's emails about the smoking violations.

159. Defendant's June 12, 2025 conversation with Plaintiff revealed the calculated nature of her breach of warranty of habitability when she demanded to know "how" smoke was entering Plaintiff's unit while possessing full knowledge that she had enforced the authorized the smoking accommodation by Defendant Crisalli that made such infiltration inevitable.

160. Defendant Condon's technical knowledge of smoke infiltration methods, demonstrated during the June 12, 2025 conversation, confirms that she understood the impossibility of maintaining habitable conditions while secretly enforcing Defendant Crisalli's authorized smoking activities, yet she chose to maintain the uninhabitable environment rather than honor her warranty obligations.

161. When Plaintiff requested transfer to another unit as far away as possible from the authorized smoker as Plaintiff now knew it would not be halted, Defendant Condon falsely

claimed no units were available while simultaneously admitting to conducting *daily showings* of available units, demonstrating her intent to deny Plaintiff habitable alternatives while maintaining the uninhabitable conditions and further exploited by Defendant Crisalli.

162. Defendant Condon's false claims about receiving *daily reports* of Plaintiff speaking to other residents, when only two units (each with two residents) had been contacted about the habitability issues, constituted retaliation designed to prevent Plaintiff from seeking resolution of the warranty violations through legitimate resident communications.

163. Rather than remedy these habitability violations, Defendants deliberately exacerbated them by secretly authorizing the conduct that created uninhabitable conditions, while fraudulently representing to Plaintiff that they were attempting enforcement—conduct that transforms this from mere negligent maintenance to intentional creation of uninhabitable conditions.

164. Defendant Condon's coordination with the on-site maintenance employee, Brandon Crandall, and the service technician to fabricate false reports blaming Plaintiff for a defective appliance repair, while simultaneously denying Plaintiff access to her proper laundry unit needed to combat smoke contamination of fabrics and clothing, constitutes additional breach of warranty obligations by preventing Plaintiff from mitigating the uninhabitable conditions.

165. The secondhand smoke infiltration caused Plaintiff to suffer severe health impacts, including respiratory distress, elevated blood pressure requiring emergency medical intervention, a bloodshot eye, and other symptoms requiring Plaintiff to periodically vacate the premises for health protection.

166. Defendants conduct constitutes an aggravated breach of the warranty of habitability because they not only failed to maintain habitable conditions but actively created and maintained uninhabitable conditions through deliberate accommodation of smoking while deceiving Plaintiff about enforcement efforts.

167. Defendant Crisalli's retaliation against Plaintiff for asserting warranty rights, including coordination of communication restrictions and false harassment implications, violates New York law protecting residents who seek enforcement of habitability standards.

168. The systematic nature of Defendant's warranty violations, spanning months of deliberate deception while maintaining uninhabitable conditions, combined with her retaliation when confronted with evidence of their conduct, demonstrates willful and egregious breach warranting enhanced damages.

169. As a direct and proximate result of Defendants breach of the warranty of habitability, Plaintiff has suffered damages including health and medical impacts, costs of mitigation efforts, loss of use and enjoyment of the premises, constructive removal, and additional expenses from Defendant's interference with necessary maintenance services.

WHEREFORE, Plaintiff demands judgment against Defendant for compensatory damages, consequential damages, rent abatement, punitive damages, costs, pre- and post-judgment interest, and such other relief as this Court deems just and proper.

## FIFTH CAUSE OF ACTION: ATTEMPTED CONSTRUCTIVE EVICTION (TO GET PLAINTIFF TO VOLUNTEER TO CANCEL HER LEASE CONTRACT)

170. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

171. Under New York law, constructive eviction occurs when an owner's acts or omissions substantially and materially deprive a resident of the beneficial use and enjoyment of the premises, rendering the premises uninhabitable with the *intent* to force the resident to vacate voluntarily because the resident is under no violations.

172. Defendants engaged in a deliberate campaign to, according to New York law, constructively remove Plaintiff by creating and maintaining uninhabitable conditions through secret authorization of smoking activities while fraudulently claiming inability to enforce the non-smoking policy, with the clear intent to force Plaintiff's departure from the premises.

173. This attempted constructive removal demonstrates Defendants calculated business strategy to force Plaintiff's voluntary departure rather than honor lease obligations, allowing Defendants to re-rent the unit to potentially another smoker without legal consequences for breach of contract.

174. Defendants attempted constructive attempt is evidenced by their deliberate choice to accommodate smoking residents through lease modifications rather than enforce Plaintiff's contractual rights, demonstrating preference for Plaintiff's departure over honoring lease obligations.

175. Defendants systematic creation of uninhabitable conditions includes: (a) secretly authorizing smoking through lease amendments while misrepresenting enforcement efforts to Plaintiff; (b) offering meetings they never intended to implement to create delay while

maintaining hazardous conditions; (c) first suggesting Plaintiff relocate to upper floors initially rather than enforce existing lease terms; (d) later, when Plaintiff uncovered evidence of fraud, Defendants falsely claimed no units were available for transfer while conducting *daily showings* of available units; (e) coordinating retaliatory communication restrictions when Plaintiff refused to voluntarily vacate.

176. Defendant's June 12, 2025 escalation of constructive eviction tactics included: (a) false implications that Plaintiff was speaking daily to other residents for legitimate habitability communications; (b) fabricated claims of receiving *daily reports* about Plaintiff which were reports of violations texted directly to Defendant Crisalli; (c) Defendant Crisalli's implementation of company-wide communication restrictions to intimidate Plaintiff; and (d) refusal to provide an alternative unit while admitting to daily showings of available units.

177. The persistent infiltration of secondhand smoke into Plaintiff's unit created conditions that: (a) exposed Plaintiff to a Class A carcinogen as classified by the EPA; (b) forced Plaintiff to wear masks inside the apartment to mitigate exposure; (c) required Plaintiff to use air purifiers continuously; (d) compelled Plaintiff to cover her head while sleeping to create barriers against smoke infiltration; (e) necessitated the relocation of living activities between rooms to escape smoke infiltration; (f) prevented normal ventilation of the apartment; (g) required constant cleaning and laundering of personal belongings contaminated by smoke; and (h) forced removal of fabric items from living areas due to smoke contamination.

178. These conditions were not the result of negligent enforcement but were deliberately created and maintained by Defendants secret accommodation of smoking residents while deceiving Plaintiff about enforcement capabilities and intentions.

179. Defendant Condon's coordination with maintenance staff to fabricate false reports and deny necessary appliance services constitutes additional constructive removal tactics designed to make Plaintiff's continued tenancy impossible while preventing her from mitigating the uninhabitable conditions.

180. Defendants attempted constructive removal tactic represents sound legal strategy by Plaintiff to seek redress rather than capitulation, as Plaintiff refuses to reward Defendants unlawful conduct by voluntarily vacating and thereby allowing Defendant to avoid legal consequences for their systematic breach of lease obligations.

181. The intolerable conditions were not temporary or minor inconveniences but persistent, substantial interferences with Plaintiff's basic living functions that continued for weeks despite repeated complaints, and were deliberately maintained through Defendants secret policy reversals.

182. Defendants were given ample notice of these conditions through Plaintiff's multiple reporting of the violations beginning on April 4, 2025, yet chose to accommodate violators rather than honor Plaintiff's lease rights, demonstrating their intent to force Plaintiff's departure through uninhabitable conditions.

183. Defendants attempted constructive removal has forced Plaintiff to endure severe health impacts requiring emergency medical intervention, including respiratory distress, elevated blood pressure, and ongoing symptoms, as Plaintiff properly refused to abandon tenancy rights without legal challenge to Defendants unlawful conduct.

184. Plaintiff suffered significant emotional distress as a direct result of Defendants deliberate campaign to force vacation through uninhabitable conditions, including: (a) severe anxiety and distress from being forced to wear masks inside Plaintiff's own home; (b) sleep disruption and psychological distress from defensive measures against smoke infiltration; (c) constant fear regarding health hazards of carcinogenic exposure; (d) emotional trauma from discovering Defendant's fraudulent conduct and deliberate accommodation of smoking; (e) psychological distress from realizing that Defendant preferred Plaintiff's departure over honoring contractual obligations; and (f) additional distress from Defendant's retaliatory conduct resulting in a June 14, 2025 nightmare that forced Plaintiff out of her sleep to complete this complaint and file it as quickly as possible.

185. As a direct and proximate result of this attempted constructive eviction, Plaintiff has suffered damages while properly refusing to capitulate to Defendants unlawful conduct, including: (a) health impacts from prolonged exposure to uninhabitable conditions; (b) costs of defensive measures including air purification and constant cleaning; (c) emotional distress from Defendant's deliberate deception; (d) loss of peaceful enjoyment of the premises through Defendants systematic campaign; (e) ongoing damages from Defendants refusal to honor lease obligations while accommodating violators; and (f) additional expenses from interference with necessary maintenance services.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, consequential damages, punitive damages due to the deliberate nature of the attempted constructive eviction, costs, pre- and post-judgment interest, and such other relief as this Court deems just and proper.

**SIXTH CAUSE OF ACTION: NEGLIGENCE**

186. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

187. Defendants owed Plaintiff a duty of care to maintain the premises in a safe and habitable condition, including the duty to: (a) enforce the property's non-smoking policy as advertised and contractually agreed; (b) promptly investigate and address reports of smoking violations affecting habitability; (c) implement appropriate enforcement measures to prevent secondhand smoke infiltration; (d) maintain air quality standards consistent with the property's luxury designation and non-smoking status; (e) provide accurate information about enforcement capabilities and efforts rather than misrepresenting actions; (f) respond to resident communications about habitability issues in good faith; and (g) coordinate with leasing staff to ensure proper enforcement of lease terms.

188. Defendants breached her duty of care through both acts and omissions, including: (a) failing to disclose the authorized smoking through lease amendments while claiming enforcement difficulties; (b) failing to implement timely and effective enforcement measures despite repeated complaints; (c) failing to properly monitor and maintain air quality throughout the building; (d) negligently misrepresenting enforcement efforts and capabilities to Plaintiff; (e) failing to follow standard violation notice procedures until faced with legal consequences; (f) negligently creating and maintaining conditions that exposed Plaintiff to known carcinogens; (g) failing to warn Plaintiff that smoking had been officially authorized in neighboring units; (h) coordinating with leasing staff to avoid

addressing smoking violations; and (i) negligently allowing coordination between the on-site maintenance employee, Brandon Crandall, and smoking violators.

189. Defendants June 12, 2025 conduct revealed additional breaches of duty including: (a) demanding technical details about smoke infiltration while possessing knowledge that infiltration was inevitable due to authorized smoking accommodation; (b) falsely implying own use of the term harassment for a respectful note when Plaintiff engaged in legitimate resident communications about habitability; (c) failing to provide accurate information about unit availability while conducting daily showings; and (d) negligently coordinating retaliatory communication restrictions that interfered with Plaintiff's ability to report habitability issues.

190. Defendants coordination with the on-site maintenance employee, Brandon Crandall, to use fabricated false reports constituted additional breach of duty by: (a) failing to ensure accurate documentation of maintenance issues; (b) negligently allowing fabricated claims about Plaintiff's responsibility for defective appliance repairs; (c) failing to provide proper appliance maintenance while demanding payment and threatening security deposit reduction if replaced based on false reports; and (d) interfering with Plaintiff's ability to mitigate smoke contamination through necessary laundry services.

191. Defendant's conduct fell below the standard of care expected of reasonable property managers, particularly for a luxury residential property marketed with specific health and safety features, as evidenced by: (a) the secret accommodation of smoking while claiming enforcement efforts; (b) technical knowledge of smoke infiltration that contradicted claims of helplessness; (c) failure to provide accurate information about the actual status of smoking permissions; (d) inadequate response to documented health impacts requiring

emergency medical intervention; (e) coordination of retaliation against a resident asserting habitability rights; and (f) failure to ensure coordination among property management staff regarding smoking violations.

192. Defendants negligence in coordinating with other property management staff, as evidenced by the Defendant Condon's dismissive response when Plaintiff noted that the leasing agent failed to respond to emails about smoking violations, demonstrates systematic failure to maintain proper property management standards.

193. As a direct and proximate result of Defendants negligent conduct, Plaintiff suffered foreseeable harm, including: (a) prolonged exposure to secondhand smoke due to Defendants misrepresentations about enforcement; (b) severe health impacts including respiratory distress and elevated blood pressure requiring emergency medical response; (c) ongoing health symptoms including bloodshot eyes and respiratory irritation; (d) costs of medical treatment and ongoing health monitoring; (e) expenses for air purification and defensive measures; (f) costs of constant cleaning and laundering due to smoke contamination; (g) emotional distress from health impacts and discovery of Defendan's deceptive conduct; (h) loss of use and enjoyment of the premises; (i) additional expenses from interference with necessary maintenance services; and (j) costs associated with combating fabricated maintenance reports.

194. Defendants negligent failure to coordinate proper responses among property management staff, including the leasing agent's failure to respond to Plaintiff's emails about smoking violations, contributed to the prolonged exposure and escalated health impacts.

195. Defendants negligence in allowing coordination between maintenance staff and smoking violators, as observed during Plaintiff's June 12, 2025 conversation when the on-site

maintenance employee, Brandon Crandall, was discovered socializing with the smoking resident, demonstrates systematic failure to maintain professional boundaries necessary for proper property management.

196. Defendants negligence was a substantial factor in causing Plaintiff's damages, as reasonable enforcement of the non-smoking policy, accurate disclosure of smoking permissions, or proper coordination among property management staff would have prevented the prolonged exposure and associated health impacts.

197. The damages suffered by Plaintiff were foreseeable consequences of Defendants negligent property management and misrepresentations, as secondhand smoke exposure in residential settings is a known health hazard, particularly when residents specifically seek non-smoking environments due to health concerns and when property managers possess technical knowledge of smoke infiltration methods.

198. Defendants negligent retaliation against Plaintiff for asserting habitability rights, including coordination of false harassment implications and communication restrictions, created additional foreseeable harm by interfering with Plaintiff's ability to seek resolution of the underlying negligent conduct.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, consequential damages, costs, pre- and post-judgment interest, and such other relief as this Court deems just and proper.

**SEVENTH CAUSE OF ACTION: RETALIATION UNDER NEW YORK REAL PROPERTY LAW Section 223-B**

199. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

200. New York Real Property Law Section 223-b prohibits property managers, property owners, etc. from retaliating against residents who make good faith complaints about health or safety violations, warranty of habitability breaches, or who take actions to secure or enforce rights under their lease or applicable law.

201. Plaintiff made good faith complaints to Defendants regarding smoking violations that constituted health and safety law violations, warranty of habitability breaches under Real Property Law Section 235-b, and violations of the lease agreement's non-smoking provisions.

202. Plaintiff took actions in good faith to secure and enforce rights under the lease agreement and New York's warranty of habitability law by reporting smoking violations, requesting enforcement of the non-smoking policy, and seeking resolution of uninhabitable conditions.

203. Plaintiff's communications with neighbors about smoke infiltration only after no policy enforcement affecting habitability constituted good faith actions to secure enforcement of lease rights and warranty of habitability protections, as residents have the right to investigate and address conditions that render their units uninhabitable.

204. In direct retaliation for Plaintiff's good faith complaints and enforcement actions, Defendants engaged in substantial alteration of the terms of tenancy and other retaliatory conduct, including:

205. False Irritation Implications: On June 12, 2025, Defendant falsely implied that Plaintiff could be considered as harassing other residents for engaging in legitimate communications about habitability issues, specifically characterizing Plaintiff's respectful courtesy note to a neighbor as improper conduct.

206. Fabricated Claims of Daily Reports: Defendant Condon falsely stated she was receiving "reports daily" about Plaintiff, when in fact only two units in the entire building had been contacted by Plaintiff regarding smoking violations affecting habitability.

207. Coordination of Communication Restrictions: Defendants conspired to implement company-wide communication restrictions, directing that "every employee in the company" must "terminate communication" with Plaintiff, substantially altering the terms of tenancy by denying Plaintiff access to normal property management services for reporting violations via text and email.

208. Denial of Unit Alternatives: When Plaintiff requested transfer to another unit away from the authorized smoker after noting that the breach was intentional, Defendants falsely claimed no units were available while simultaneously admitting to conducting "daily showings" of available units, denying Plaintiff reasonable accommodation within the property.

209. Fabricated Maintenance Reports: Defendants coordinated with the on-site maintenance employee, Brandon Crandall, to use a false report blaming Plaintiff for a defective appliance repair, then demanded, if the washer is replaced, $1,200 payment and threatened deduction from security deposit as financial retaliation to replace the appliance that was under warranty and not properly repaired over two months ago.

210. Service Denial and Restrictions: Defendants stated that repair technician would not provide services while Plaintiff was present as Plaintiff did not allow herself to be treated with a false narrative for the incompetent and fraudulent repair visit, creating impossible conditions for necessary repairs and substantially altering the terms of tenancy.

211. The timing of Defendant's retaliatory conduct establishes the prohibited retaliatory motive under Real Property Law Section 223-b(5), as all retaliatory actions occurred within one year of, and immediately following, Plaintiff's good faith complaints about health and safety violations and warranty of habitability breaches.

212. Defendant's escalation of retaliatory conduct on June 12, 2025, occurred immediately after Plaintiff confronted Defendants with evidence of the authorized smoking accommodation and challenged Defendant's false representations about enforcement efforts.

213. The sequence of events creates a rebuttable presumption of retaliation under Real Property Law Section 223-b(5), requiring Defendants to establish a non-retaliatory motive by a preponderance of the evidence, which Defendants cannot do given the clear temporal relationship and escalating nature of her conduct.

214. Defendant Crisalli's retaliatory conduct constituted substantial alteration of the terms of tenancy prohibited by Real Property Law Section 223-b(2), including: (a) refusal to provide normal property management services through communication restrictions; (b) denial of reasonable unit alternatives within the property; (c) creation of impossible conditions for necessary maintenance services; (d) financial penalties through threatening fabricated maintenance charges; and (e) interference with Plaintiff's ability to report and address timely habitability violations.

215. These alterations were specifically designed to punish Plaintiff for asserting her rights under the lease and warranty of habitability law, and to prevent further challenges to Defendants unauthorized smoking accommodation.

216. Defendants cannot establish a non-retaliatory motive for their conduct because: (a) the communication restrictions and service denials had no legitimate property management purpose; (b) the false claims were demonstrably untrue and served only to discredit Plaintiff's legitimate complaints; (c) the fabricated maintenance reports were created specifically to impose financial penalties; (d) the denial of unit alternatives while showing units to others reveals discriminatory intent; and (e) all retaliatory actions escalated immediately after Plaintiff's discovery of the authorized smoking accommodation.

217. As a direct and proximate result of Defendants retaliatory conduct, Plaintiff suffered damages including: (a) interference with ability to obtain necessary property management services; (b) financial penalties through fabricated maintenance charges; (c) denial of reasonable unit alternatives within the property; (d) emotional distress from systematic retaliation for asserting legal rights; (e) additional costs associated with combating false claims and reports; and (f) continued exposure to uninhabitable conditions.

218. Plaintiff is entitled to damages, attorney's fees, costs, and injunctive relief under Real Property Law Section 223-b(3), including orders requiring Defendants to cease all retaliatory conduct and restore normal tenancy services.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, attorney's fees and costs, injunctive relief prohibiting further retaliation, and such other relief as this Court deems just and proper under Real Property Law Section 223-b.

**EIGHTH CAUSE OF ACTION: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

219. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

220. Defendants engaged in extreme and outrageous conduct that exceeded all bounds of decency and was calculated to cause severe emotional distress to Plaintiff.

221. Defendants conduct was intentional and deliberately designed to cause emotional harm, including: (a) secretly authorizing smoking activities while fraudulently representing enforcement efforts, forcing Plaintiff to endure prolonged health-damaging exposure; (b) deliberately creating a facade of good faith problem-solving through promised meetings that were never intended to occur; (c) knowingly subjecting Plaintiff to carcinogenic exposure while misrepresenting their ability and willingness to address the hazard; and (d) forcing Plaintiff to discover their deceptive conduct through direct confrontation with a terminally ill neighbor after months of health crises.

222. Defendants knew or should have known that their conduct would cause severe emotional distress, particularly given: (a) Plaintiff's explicitly stated health concerns during pre-leasing conversations; (b) Plaintiff's documented reports of severe health impacts requiring emergency medical intervention; (c) the prolonged nature of their deceptive conduct spanning nearly two months; and (d) their awareness that Plaintiff was desperately seeking resolution while they secretly undermined those efforts.

223. The circumstances of Plaintiff's discovery of Defendants fraudulent conduct were particularly cruel and calculated to cause maximum emotional distress: (a) forcing Plaintiff to confront a dying neighbor in the early morning hours due to health symptoms; (b) learning that Defendants had been deliberately deceiving Plaintiff while

accommodating the very conduct that was destroying Plaintiff's health; (c) realizing that months of good faith efforts to work with Defendants were based on their fraudulent misrepresentations; and (d) discovering that Defendants preferred to accommodate smoking rather than honor their contractual obligations to Plaintiff.

224. As a direct result of Defendants extreme and outrageous conduct, Plaintiff has suffered severe emotional distress, including: (a) horror and shock at discovering the deliberately deceptive nature of Defendants conduct; (b) profound betrayal and distress from learning that trusted property management had been systematically deceiving Plaintiff; (c) anxiety and fear regarding the health implications of prolonged carcinogenic exposure that could have been avoided; (d) emotional trauma from being forced into yet another legal battle when Plaintiff explicitly sought to avoid such conflicts; (e) distress from realizing that Plaintiff's good faith efforts to resolve the matter were deliberately frustrated by Defendant's fraudulent conduct; and (f) ongoing anxiety about health impacts and the need for continued medical monitoring.

225. The severity of Plaintiff's emotional distress is evidenced by: (a) physical manifestations including elevated blood pressure requiring emergency medical response; (b) sleep disruption and ongoing anxiety about health impacts; (c) the traumatic circumstances of discovering Defendant's deception through speaking with a terminally ill neighbor; and (d) Plaintiff's expressed horror at being forced into unwanted litigation due to Defendants misconduct.

226. Defendants conduct was so extreme and outrageous that it exceeds all bounds of decency tolerated in a civilized society, particularly their deliberate deception of a resident who had

explicitly expressed health concerns and their calculated campaign to force vacation through fraudulent means.

227. Defendant Crisalli's extreme and outrageous conduct escalated dramatically on June 12, 2025, when Plaintiff made her first follow-up contact in two months regarding the ongoing smoking violations, demonstrating that Defendant Crisalli's claims of excessive employee contact were deliberately false and designed to further inflict emotional distress.

228. Despite Plaintiff having had no phone conversations with the Defendants for two months and Defendants having ignored Plaintiff's written notices regarding the smoking violations, Defendant Crisalli responded to Plaintiff's single follow-up inquiry with an immediate, hostile, and retaliatory communication designed to maximize emotional harm.

229. The timing and nature of Defendant Crisalli's June 12, 2025 response was particularly cruel and calculated to cause severe emotional distress, as it occurred: (a) immediately after Plaintiff's first attempt to follow up on ignored violations in two months; (b) in direct response to Plaintiff's legitimate inquiry about smoking accommodations; (c) through deliberately false characterizations of Plaintiff's minimal contact as harassment; and (d) with comprehensive communication restrictions designed to isolate and punish Plaintiff

230. Defendant Crisalli's false claims that Plaintiff was "tying up the time of every employee in the company" constituted deliberate misrepresentation designed to gaslight Plaintiff and create a false narrative of harassment, when in fact: (a) Plaintiff had not spoken to the Defendant by phone for two months prior to June 12, 2025; (b) Plaintiff's communications were limited to standard written notices of lease violations; (c) Defendants had been ignoring Plaintiff's legitimate concerns rather than being overwhelmed by them; (d) the June 12th contact was Plaintiff's first follow-up attempt after weeks of being ignored.

231. The extreme nature of Defendant Crisalli's retaliatory response—restricting all employee communication and issuing company-wide directives—was grossly disproportionate to Plaintiff's minimal contact and was specifically designed to: (a) humiliate Plaintiff through false characterizations; (b) isolate Plaintiff from normal resident services and communications; (c) create additional barriers to addressing habitability concerns; and (d) punish Plaintiff for discovering and confronting their fraudulent conduct.

232. Defendants conduct demonstrates a calculated escalation designed to inflict maximum emotional distress precisely when Plaintiff attempted to follow up on violations, revealing their intent to punish Plaintiff for persistence in seeking enforcement of contractual rights.

233. As a direct result of Defendants retaliatory conduct, Plaintiff has suffered additional severe emotional distress, including: (a) shock and disbelief at the extreme hostility in response to a routine follow-up inquiry; (b) distress from being falsely characterized as harassing when maintaining minimal contact; (c) anxiety from the retaliatory measure; (d) fear regarding ability to report future emergencies or maintenance issues; (e) harm from company-wide directives based on false harassment claims; and the (f) realization that Defendants preferred retaliation over addressing legitimate habitability concerns.

234. The severity of Defendants retaliatory response after ignoring Plaintiff's concerns demonstrates their deliberate intent to inflict emotional harm rather than resolve issues, constituting extreme and outrageous conduct that exceeds all bounds of decency.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages for emotional distress, punitive damages due to the deliberate and outrageous nature of Defendant's conduct, including their June 12, 2025 retaliatory escalation, costs, pre- and post-judgment interest, and such other relief as this Court deems just and proper.

## PRAYER FOR RELIEF

Based on the foregoing, Plaintiff seeks the following relief:

### IMMEDIATE INJUNCTIVE RELIEF TO PROTECT HEALTH AND SAFETY

1. Emergency injunctive relief requiring Defendants to immediately cease all authorized smoking activities that create secondhand smoke infiltration affecting Plaintiff's unit and other non-smoking residents, given the documented health impacts requiring emergency medical intervention and the ongoing exposure to EPA-classified Class A carcinogens to all residents, including vulnerable babies, children, and the elderly.
2. Injunctive relief requiring Defendants to post and maintain clearly visible signage prohibiting smoking within 25 feet of all buildings, as required by standard property management practices for protecting non-smoking residents from secondhand smoke exposure and the implementation of clear non-smoking signs inside the building at all doors and exits.
3. Injunctive relief requiring Defendants to implement comprehensive operational transparency measures including mandatory maintenance documentation policies requiring all residents receive copies of maintenance resolution reports documenting arrival/departure times, findings, work performed, and resolution status—consistent with standard industry practice for property management accountability and essential for investor protection in SEC-registered real estate investment operations—as investors in QP2 Properties, LLC's $5,000,000 offering have legitimate expectations of professional asset management, documented operational procedures, and transparency in property maintenance that directly affects asset values, liability exposure, and investment returns, with such operational standards constituting material information affecting investor decision-making and SEC disclosure obligations

4. Injunctive relief requiring Defendants to immediately remove and retract the falsified soap theory fabrication that was disproven during the June 12, 2025, maintenance visit, as such fraudulent maintenance reporting creates undisclosed liability exposure for the SEC-registered investment entity, misrepresents operational competency to current and prospective investors, violates fiduciary duties to investment participants, and demonstrates systematic lack of professional oversight that endangers both resident welfare and investor capital preservation in this federally regulated real estate investment operation.
5. Injunctive relief requiring Defendants to immediately cease all smoking authorizations that compromise the non-smoking status of the building and to implement proper enforcement mechanisms for the contracted non-smoking policy.
6. Injunctive relief requiring Defendants to implement a transparent maintenance policy requiring all residents receive copies of maintenance resolution reports documenting arrival/departure times, findings, work performed, and resolution status, consistent with standard industry practice for property management accountability, and to immediately remove and retract the falsified soap theory fabrication that was disproven during the June 12, 2025, maintenance visit.
7. Injunctive relief requiring Defendants to install proper air filtration systems and ventilation improvements to prevent smoke infiltration between units and ensure the building maintains its advertised non-smoking environment.

## FEDERAL SECURITIES AND INVESTOR PROTECTION

8. Immediate SEC notification of this action and all material facts contained herein, given Defendants' management of millions in investor capital while engaging in systematic fraud, civil rights violations, and concealment of material litigation exposure requiring federal securities law disclosure to protect investor interests and market integrity.

9. Immediate notification to all investors of this litigation and the material risks it represents to their investments, including disclosure of Defendants' systematic resident abuse, civil rights violations, operational practices that contradict marketed property characteristics, and substantial undisclosed liability exposure requiring immediate disclosure under federal securities law.

10. Injunctive relief requiring Defendants to immediately disclose to all current and prospective investors the existence of this litigation, the systematic operational violations documented herein, and the substantial liability exposure created through their fraudulent property management practices and civil rights violations.

11. Relinquish of all profits obtained through the fraudulent investment property scheme, including rental income collected while operating properties contrary to marketed specifications and investor representations.

## FINANCIAL REMEDIATION

12. Complete rent abatement for the entire period during which the warranty of habitability was breached.

13. Punitive damages for Defendants' intentional, fraudulent, and outrageous conduct in deliberately creating uninhabitable conditions while deceiving Plaintiff about enforcement

efforts, coordinating fabricated maintenance reports, and retaliating against Plaintiff for asserting resident rights.

14. Full refund of security deposit given Defendants' material and intentional breach and negligence of lease obligations.
15. Compensation for all health-related expenses, including emergency medical treatment, ongoing medical monitoring, and future healthcare costs related to carcinogenic exposure caused by Defendants' authorized smoking accommodation.
16. Damages for emotional distress, mental anguish, and psychological harm sustained as a direct result of Defendants' deliberate creation of uninhabitable conditions, fraudulent misrepresentations, systematic retaliation, and coordination of false documentation.
17. Reimbursement for all expenses related to mitigating smoke exposure and defensive measures required due to Defendants' authorized smoking violations.
18. Compensation for interference with necessary services, including costs associated with combating Defendants' fabricated maintenance reports and expenses incurred due to denial of proper appliance maintenance services.
19. Compensation for all expenses only if Plaintiff is ultimately forced to voluntarily vacate due to Defendants' continued breach and retaliation, as Plaintiff should not be required to abandon tenancy rights due to Defendants' misconduct.

**ONGOING OVERSIGHT AND PROTECTION**

20. Judicial oversight of policy implementation and compliance for a period of twelve months to ensure proper remediation, prevent future fraudulent conduct toward residents, and monitor Defendants' adherence to non-smoking policy enforcement.

21. Injunctive relief preventing Defendants from retaliating against Plaintiff or any other residents who assert habitability rights or report lease violations.

22. Injunctive relief requiring Defendants to provide accurate information to all residents about smoking accommodations and to cease lease agreements declaring the property as non-smoking while maintaining secret smoking authorizations.

23. Injunctive relief preventing Defendants' on-site co-conspirator, Brandon Crandall, from handling maintenance requests for Plaintiff due to his unethical conduct in aiding and abetting the creation of false reports and his concealment of the authorized smoking arrangement with the new resident—whom he has apparently befriended, creating a clear conflict of interest that compromises his ability to perform impartial property maintenance duties for Plaintiff.

**DECLARATORY RELIEF**

24. Declaratory judgment that Defendants' conduct constituted intentional breach of contract, fraudulent misrepresentation, attempted constructive eviction through fraud, investment property fraud, and violations of New York's Deceptive Practices Act.

25. Declaratory judgment that Defendants' coordination of fabricated maintenance reports and retaliatory conduct violated Plaintiff's resident rights and constituted systematic fraud affecting both residents and investors.

26. Declaratory judgment that Defendants' systematic concealment of material information from investors constitutes securities fraud requiring immediate federal disclosure and regulatory intervention.

## GENERAL RELIEF

27. Reasonable attorneys' fees and any costs incurred in bringing this action, given Defendants' bad faith conduct and the invitation to legal action to address their systematic violations.

28. Pre-judgment and post-judgment interest to the extent permitted by law.

29. Federal criminal referral to appropriate authorities for investigation of potential violations of federal securities laws, civil rights violations, RICO conspiracy as multiple participants knew about the harm to Plaintiff, obstruction of justice through false maintenance reports, tax fraud regarding improper of $1.3 million in taxpayer benefits while violating community health standards, and environmental health violations for deliberate creation of EPA-classified carcinogenic exposure, all documented herein.

30. Such other and further relief as this Court deems just and proper under the circumstances, including any additional measures necessary to ensure Defendants' compliance with lease obligations, federal securities laws for a SEC-registered real estate investment entity, and prevention of future fraudulent conduct affecting both residents and investors.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

## CERTIFICATION AND CLOSING

## UNDER FEDERAL RULE OF CIVIL PROCEDURE 11

By signing below, I certify to the best of my knowledge, information, and belief that this complaint:

1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law;

3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.

I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: June 16, 2025

Onondaga County, New York

Susan Keith, Plaintiff
P.O. Box 183
Clay, New York
13041
Email: JusticeNewYork@proton.me

*(Case citations supporting these allegations have been excluded per court instructions for self-represented litigants, even when utilizing limited scope counsel as Plaintiff)*